STATE OF NEBRASKA, APPELLEE, V. ROBIN K. BURCHETT, APPELLANT.
399 N.W.2d 258

Filed December 29, 1986.    No. 85-137.

Roger C. Lott, for appellant.

Robert M. Spire, Attorney General, and William L. Howland, for appellee.

KRIVOSHA, C.J., BOSLAUGH, WHITE, HASTINGS, CAPORALE, SHANAHAN, and GRANT, JJ.

PER CURIAM.

The defendant was charged with first degree murder in the death of Juana Lea Rolenc. He was found guilty by the jury and sentenced to life imprisonment.

Upon appeal he has made seven assignments of error, including the contention that the evidence was insufficient to support the verdict.

In reviewing the sufficiency of the evidence to sustain a conviction in a jury trial,

> this court does not resolve conflicts of evidence, pass on credibility of witnesses, evaluate explanations, or reweigh evidence presented to a jury—all of which is within a jury's province for disposition. A verdict in a criminal case must be sustained if the evidence, viewed and construed most favorably to the State, is sufficient to support that verdict.

*State v. Fleming*, 223 Neb. 169, 176, 388 N.W.2d 497, 502-03 (1986) (quoting *State v. Schott*, 222 Neb. 456, 384 N.W.2d 620 (1986)).

Juana Rolenc's body was discovered in a creek north of Lincoln, Nebraska, on May 11, 1983. Several large pieces of concrete had been tied to her body. The cause of death was either a spinal injury or strangulation.

The victim was married to Clement Rolenc in 1967. The marriage was dissolved in 1981, and at the time of her death, Juana was attempting to have the original decree of dissolution, which provided her with no alimony or support, set aside.

Clement Rolenc was a patron of a bar in Gresham, Nebraska, owned by defendant Burchett. On several occasions, beginning in October of 1981, Rolenc asked Burchett if he would get rid of a body for $5,000. Burchett testified that he had not taken Rolenc seriously, although on occasion he was paid not to discuss the proposal with anyone else.

Regular contact between the two men ended in March of 1982 when Burchett closed the Gresham bar.

On May 8, 1983, Rolenc contacted Burchett at his home in Grand Island, Nebraska. During the course of the conversation, Burchett advised Rolenc that he planned to go to Lincoln on May 11, 1983. Rolenc asked Burchett to call him because he might have some farmwork for the defendant to do. Burchett did call Rolenc, and a meeting at a truckstop in Lincoln was arranged. Burchett testified that Rolenc wanted him to load rabbit hutches in Lincoln.

On May 10, 1983, Burchett asked Wayne Haselhuhn to go to Lincoln with him. Haselhuhn testified that Burchett offered him $200 for doing so, without disclosing the details of what he had to do to earn the money. The two men left for Lincoln in Burchett's car sometime after 8 the next morning. Burchett, as well as Tammie Davis, Haselhuhn's roommate, testified that the purpose of the trip was to buy drugs.

Upon arriving in Lincoln, Burchett and Haselhuhn met the Rolencs at a local truckstop. Haselhuhn, at some point, got in the Rolenc car and seated himself behind Juana, who was in the front passenger seat. Haselhuhn then strangled the victim as Rolenc drove down a country road.

Haselhuhn and Rolenc then relocated Burchett. Haselhuhn and Burchett proceeded to dispose of the body. All three men were eventually arrested and charged.

A thorough review of the record shows uncontradicted evidence that Clement Rolenc asked the defendant on several occasions if he would be interested in disposing of a body, presumably the victim's, for $5,000. The defendant admitted this was a topic of conversation between himself and Rolenc on May 8, 1983, 3 days before the murder. Burchett also admitted to asking Edwin Tierney if he would like to earn $200 by riding with him to Colorado to deliver a gunnysack. This conversation

occurred shortly before the murder. He also admitted that he had arranged to meet Rolenc at a Lincoln truckstop on May 11, 1983. At Burchett's suggestion, Wayne Haselhuhn accompanied the defendant to Lincoln on that date. When the pair arrived in Lincoln, they met Rolenc at the truckstop. At some point, Haselhuhn, who had never met Clement Rolenc before, climbed into the backseat of the Rolenc vehicle and strangled the victim.

The defendant admits that he helped dispose of the body, but claims that he did so because he was threatened by the other two men.

According to Haselhuhn, he was unaware of how he was to earn the $200 promised by Burchett, until Burchett and he had gone from the truckstop to a location southwest of Lincoln. At that point, Haselhuhn testified, the defendant told him to take the defendant's belt, sit in the Rolenc car behind the victim, and choke her. Haselhuhn testified that he complied with this directive.

Burchett, in his testimony, indicated that his only purpose in meeting Rolenc in Lincoln was to assist Rolenc in loading rabbit hutches; that the overall purpose of the trip was to purchase marijuana. When he arrived in Lincoln, Burchett testified, he did not feel like moving the hutches because he was high from smoking marijuana. Haselhuhn allegedly expressed interest in taking Burchett's place. According to Burchett, Haselhuhn agreed, at the truckstop, to help Rolenc move the hutches. It was agreed that Burchett would meet the other two men in an hour at Yankee Hill brick company. Burchett then left Haselhuhn with the Rolencs and proceeded to his in-laws' (the Tierneys') home. Terry Tierney, the defendant's brother-in-law, corroborated Burchett's testimony that he visited the Tierney residence alone.

When he later met with Rolenc and Haselhuhn near Yankee Hill brick company, Burchett testified that Rolenc was armed and ordered him to open the trunk of his (Burchett's) car. After the victim was transferred to Burchett's trunk, Rolenc ordered the other two men to take her to the Missouri River. Burchett testified that he complied with the order to dispose of the body because he was afraid of the other two men. When Haselhuhn

got in the car, he had two envelopes full of money, one of which he threw on the dashboard and which, according to Burchett, was for taking the victim to the river.

En route to the creek where the victim's body was left, the defendant made two stops where he had the opportunity to flee. The first was at a gas station in Lincoln. As the defendant filled his vehicle with gasoline, Haselhuhn used the restroom. Burchett testified he was too frightened to flee. The second stop was at a store because, according to Burchett, Haselhuhn wanted to get rope to tie rocks to the victim's body. Burchett went in to purchase the rope as Haselhuhn waited in the car. Again, Burchett testified that he took no action to escape as he was "scared" and thought he was just as involved as the others at this point.

Basically, the defendant's assignment is an attack on the credibility of Haselhuhn's testimony. It is true that Haselhuhn's testimony was contradicted in several respects by the independent testimony of other witnesses. The most significant of these is Haselhuhn's testimony that he and Burchett stopped at a Lincoln home after they had disposed of the body. The description of the house did not match that of the Tierney residence, nor did Haselhuhn's testimony coincide with Terry Tierney's testimony that Burchett was at the Tierney residence alone.

The defendant claims that Haselhuhn's credibility is eroded by the fact that he made several false statements, after which he was pushed by law enforcement authorities, until he reached his final statement. There was also evidence that Haselhuhn was a convicted felon with severe alcohol and drug problems. In fact, the evidence showed that Haselhuhn used large amounts of alcohol and drugs on both the evening of May 10 and the early morning and daytime hours of May 11, 1983.

A criminal conviction may be based upon the uncorroborated statements of an accomplice. *State v. Joy*, 220 Neb. 535, 371 N.W.2d 113 (1985); *State v. Huffman*, 214 Neb. 429, 334 N.W.2d 3 (1983).

Haselhuhn's testimony was corroborated in many respects. Much of the defendant's own testimony corroborates Haselhuhn's statement of the basic facts. His testimony is also

supported by that of the State's rebuttal witness, Victor Harrod, who testified that Burchett admitted to hiring Haselhuhn to kill the victim. According to Harrod, this statement occurred while he and Burchett were cellmates in the Lancaster County jail.

The evidence contradicting Haselhuhn's testimony was before the jury, which had the duty to weigh the evidence and determine the credibility of the witnesses. Although Haselhuhn had much to gain by agreeing to testify against his codefendants, his credibility was a matter for the jury.

Taking the view of the evidence most favorable to the State, the evidence was sufficient for the jury to find beyond a reasonable doubt that Wayne Haselhuhn killed the victim after being hired by the defendant to do so.

In pretrial motions Burchett moved (1) to dismiss the information for lack of presentment or indictment of a grand jury, (2) to preclude "death qualification" of the jury, (3) to preclude the use of peremptory challenges to exclude persons opposing the death penalty, (4) to declare Neb. Rev. Stat. § 29-2006(3) (Reissue 1985) unconstitutional, (5) to prohibit the State from compelling his wife, Bonnie, to testify against him, and (6) to preclude Haselhuhn's testimony. All of these motions were overruled.

Three of the defendant's assignments of error relate to "death qualification" of the jury. Initially, Burchett argues that the trial court erred in overruling his amended motion to preclude "death qualification" of the jury.

Prospective jurors in this case were questioned by the court as follows:

> I have a question for you. The charge against the defendant which I previously read from the Information is an accusation of murder known in the law as murder in the first degree. The law provides that if anyone is found guilty beyond a reasonable doubt by a jury, of first degree murder, the judge or panel of judges then must decide what the penalty is going to be. One possible penalty for first degree murder is life imprisonment and another possible penalty is capital punishment, the death penalty. The jury in this case that will decide whether or not the

defendant is guilty of murder in the first degree will be instructed that if the defendant is convicted, the jury has nothing whatever to do with the punishment and must not consider punishment in arriving at a verdict as to whether the defendant is guilty. Knowing then that the judge, not the jury, must impose the sentence in the event of the conviction of the defendant, do you have any reservations, feelings or convictions about the death penalty which would prevent you from making an impartial decision as to the defendant's guilt?

The essence of the defendant's argument is that death qualification results in a jury which is not representative of a fair cross-section of the community and is conviction-prone. See, U.S. Const. amend. VI; Neb. Const. art. VI, § 1. Burchett relies upon *Grigsby v. Mabry*, 569 F. Supp. 1273 (E.D. Ark. 1983), *aff'd* 758 F.2d 226 (8th Cir. 1985), which has since been reversed in *Lockhart v. McCree*, 476 U.S. 162, 106 S. Ct. 1758, 90 L. Ed. 2d 137 (1986), for the proposition that death penalty opponents are a distinct group, the exclusion of which creates a conviction-prone jury in violation of the defendant's constitutional rights.

The question faced by the Court in *McCree, supra* at 165, was whether the Constitution prohibited "the removal for cause, prior to the guilt phase of a bifurcated capital trial, of prospective jurors whose opposition to the death penalty is so strong that it would prevent or substantially impair the performance of their duties as jurors at the sentencing phase of the trial." The death qualification issue in *McCree* differs from that before us because in Nebraska the judge rather than the jury is responsible for sentencing upon conviction in a capital case. See Neb. Rev. Stat. § 29-2520 (Reissue 1985).

Section 29-2006(3) provides that a prospective juror may be challenged for cause where "in indictments for an offense the punishment whereof is capital . . . his opinions are such as to preclude him from finding the accused guilty of an offense punishable with death." While a prospective juror's attitudes about capital punishment are irrelevant to sentencing in Nebraska, they may be relevant to his ability to fairly determine the defendant's guilt or innocence. Prospective jurors who are

excused because they are unable either to fairly determine guilt or to fairly impose a sentence because of their opposition to capital punishment are both subsets of the group of death penalty opponents which the defendant maintains is a cognizable group. The U.S. Supreme Court rejected the cognizable group claim in *McCree, supra,* and we do the same.

In *McCree* the Court had before it much of the social science evidence which is present in the record of this case. In *McCree, supra* at 1764, the Court held that even assuming studies prove that a "death-qualified" jury is more conviction-prone than one not so qualified, "the Constitution does not prohibit the States from 'death qualifying' juries in capital cases." See, also, *State v. Peery,* 223 Neb. 556, 391 N.W.2d 566 (1986); *State v. Rust,* 223 Neb. 150, 388 N.W.2d 483 (1986). The decision is based on the conclusion that the fair cross-section requirement has never been used to invalidate for-cause or peremptory challenges or to require that petit juries mirror the composition of the community at large. Even assuming the fair cross-section requirement does extend to petit juries, the Court concluded that "groups defined solely in terms of shared attitudes that would prevent or substantially impair members of the group from performing one of their duties as jurors . . . are not 'distinctive groups' for fair cross-section purposes." *McCree, supra* at 1765. The prospective jurors excluded in *McCree* were viewed as a nondistinct group because their exclusion did not contravene the purposes of the fair cross-section requirement. Also, death qualification, unlike the wholesale exclusion of a race, sex, or nationality, "is carefully designed to serve the State's concededly legitimate interest in obtaining a single jury that can properly and impartially apply the law to the facts of the case . . . ." *McCree, supra* at 1766.

In the present case, as in *McCree,* persons excluded as the result of "death qualification" were excluded because of their inability to serve as impartial jurors and not to defeat the protections of the fair cross-section requirement. As such, we do not view the group as distinct.

Burchett also contends that § 29-2006(3) is unconstitutional to the extent that it permits questioning beyond a juror's admission that his opposition to capital punishment is so strong

as to prevent him from fulfilling his obligations as a juror. He does not cite us to instances in the record where this has occurred, but maintains that such questioning results in a "process effect." The "process effect" is defined by the defendant's expert witness, Dr. Bronson, as the effect that results from "death-qualifying" procedures. The process is said to negatively affect juror attitudes about the defendant. We have previously questioned the validity of the Haney "process effect" studies relied upon by Dr. Bronson in forming his opinion. *State v. Peery, supra.*

Nevertheless, any argument that a "death-qualified" jury is partial or biased, which is the essence of this claim, must fail because "an impartial *jury* consists of nothing more than '*jurors* who will conscientiously apply the law and find the facts.' " *Lockhart v. McCree,* 476 U.S. 162, 178, 106 S. Ct. 1758, 90 L. Ed. 2d 137 (1986). The statute in question serves to ensure that the petit jury is in fact impartial. The statute as such is constitutionally sound. See, also, *State v. Peery, supra; State v. Rust, supra.*

Burchett next contends that the trial court erred in overruling his motion to prevent the use of peremptory challenges by the State to remove all or most of the jurors who oppose the death penalty.

We addressed this issue in *State v. Peery, supra.* There, the defendant claimed that the State had used its peremptory challenges to deprive him of a fair and impartial jury by striking jurors who opposed the death penalty. The record indicated that one juror with some concern about the death penalty was excused on a peremptory challenge by the State, while another with similar attitudes was seated as a juror.

In determining that there was no constitutional violation, we noted that one inference to be drawn from *McCree* "is that the U.S. Supreme Court does not view the U.S. Constitution as doing away with peremptory challenges." *State v. Peery,* 223 Neb. 556, 563-64, 391 N.W.2d 566, 572 (1986). We reasoned further that while it is an equal protection violation for the State to use its peremptory challenges to exclude members of the defendant's race solely on racial grounds under *Batson v. Kentucky,* 476 U.S. 79, 106 S. Ct. 1712, 90 L. Ed. 2d 69

(1986), "[t]hat holding . . . does not prevent the use of peremptory challenges to exclude from a jury a venireperson who holds a point of view inimical to that espoused by the State." *State v. Peery, supra* at 564, 391 N.W.2d at 572.

In the present case four jurors who expressed some opposition or uncertainty in their views as to the death penalty were passed for cause, then stricken by the State through peremptory challenges. Another, who stated that she could act impartially so long as she did not have to pass sentence, was seated as a juror. Under *State v. Peery, supra*, the challenges were constitutional.

The defendant contends the trial court erred in allowing his wife to testify against him. Prior to trial, Burchett filed a motion in limine to preclude the State from adducing evidence against him from his wife, Bonnie Burchett. The motion was sustained on the ground that application of Neb. Rev. Stat. § 27-505 (Reissue 1985), as amended by 1984 Neb. Laws, L.B. 696, to conversations prior to the effective date of the bill would amount to an ex post facto law. The legislative bill amended the statute to eliminate the husband-wife testimonial privilege "in any criminal case where the crime charged is a crime of violence." § 27-505(3)(a); 1984 Neb. Laws, L.B. 696, § 1.

Later, the trial court modified its order to the effect that while Mrs. Burchett could not be compelled to answer questions involving confidential communications, she could be compelled to testify as to other matters.

The trial court restricted Mrs. Burchett's testimony because the defendant had been advised by counsel prior to the passage of L.B. 696 that he could talk freely with his wife. There is no showing that the defendant detrimentally relied upon the advice of counsel that his wife would not be allowed to testify as to *acts* she had observed.

The record shows that Mrs. Burchett did not testify as to any confidential communication. Instead, her testimony included information about her children; past neighbors and addresses; the defendant's and her own employment history; financial matters; the events of Mother's Day 1983 when a man in an automobile stopped at their home; matters she discussed with this man; the length of time her husband spent talking to the

man and the fact that they left together for about 20 minutes; the defendant's activities on May 11, 1983; the fact that her children returned home with the defendant with new bicycles that afternoon; the price of the bicycles; the fact that she received a $100 bill from her husband that afternoon; and her husband's acquaintance with Haselhuhn. The State points out that, for the most part, all of these matters could have been proved by other witnesses.

The gist of Burchett's argument is that prior to the amendment of § 27-505(3), he had a reasonable expectation of privacy not only in confidential communications with his wife but also in family activities which took place in confidential surroundings. Burchett maintains that his wife should not have been called to testify against him at all.

The relevant portions of § 27-505, prior to the 1984 amendment, provided:

(1) Neither husband nor wife can be examined in any case as to any confidential communication made by one to the other while married, nor shall they after the marriage relation ceases be permitted to reveal in testimony any such communication while the marriage subsisted except as otherwise provided by law. This privilege may be waived only with the consent of both spouses. After the death of one, it may be waived by the survivor.

(2) During the existence of the marriage, a husband and wife can in no criminal case be a witness against the other. This privilege may be waived only with the consent of both spouses.

(3) These privileges may not be claimed:

(a) In any criminal case where the crime charged is rape, adultery, bigamy, incest, or any crime committed by one against the person or property of the other or of a child of either or in any criminal prosecution against the husband for wife or child abandonment.

§ 27-505 (Reissue 1979).

In response to Burchett's argument the State cites § 27-505(1) (Reissue 1985) and argues that only confidential communications are protected by the statute. The statutory basis of the defendant's motion in limine and objection was

§ 27-505(2) (Reissue 1979), which, as previously noted, precludes *adverse* spousal testimony in criminal cases, with only a few limited exceptions.

The language of § 27-505(2) prior to the 1984 amendment suggests that if the trial court was correct in ruling that the amended statute would amount to an ex post facto law if applied retrospectively, Mrs. Burchett should not have been allowed to testify at all. *State v. Palmer*, 215 Neb. 273, 338 N.W.2d 281 (1983) (*Palmer II*).

Neither party on appeal briefed the issue as to whether the amended statute is ex post facto, at least in part, as applied in this case.

Today, in *State v. Palmer, ante* p. 282, 399 N.W.2d 706 (1986) (*Palmer III*), we held that § 27-505 as amended was not ex post facto in application to Palmer, who was convicted of felony murder. Under that decision Mrs. Burchett could have been called to testify as to any matter, including confidential communications. We conclude that there was no error in permitting Mrs. Burchett to testify against the defendant and that the rule stated in *Palmer III* is applicable here.

Burchett also contends that the trial court erred in admitting the testimony of Wayne Haselhuhn. The basis of this argument is that Haselhuhn testified under a plea bargain agreement which required that he testify to his last version of the events leading to Juana Rolenc's death in exchange for the State's promise not to present evidence of aggravating circumstances at his sentencing hearing. Burchett contends that it was an abuse of discretion to allow Haselhuhn to testify, because he was required to testify to the satisfaction of the prosecutor in order to receive the benefit of the plea bargain, i.e., life imprisonment as opposed to a sentence of death.

The general rule announced in other jurisdictions is that "an accomplice's testimony is admissible notwithstanding the fact that the testimony is procured by means of a plea bargain. The promise of leniency or otherwise favorable prosecutorial treatment goes only to the credibility of the accomplice's testimony, not to its admissibility." *State v. Garcia*, 102 Idaho 378, 386, 630 P.2d 665, 673 (1981). See, also, *Kelley v. State*, 460 N.E.2d 137 (Ind. 1984); *State v. DeWitt*, 286 N.W.2d 379 (Iowa

1979); *State v. Leonard*, 74 N.C. App. 443, 328 S.E.2d 593 (1985).

Generally, it is only where the prosecution has bargained for false or specific testimony, or a specific result, that an accomplice's testimony is so tainted as to require its preclusion. *United States v. Librach*, 536 F.2d 1228 (8th Cir. 1976); *State v. Garcia, supra; State v. DeWitt, supra.*

The plea agreement in the present case provided, inter alia, that (1) Haselhuhn would plead guilty to first degree murder as soon as feasible after disposition of the cases against Clement Rolenc and Robin Burchett; (2) Haselhuhn would assist the State in the investigation and prosecution of people involved in the murder, including, but not limited to, Burchett and Rolenc, "by speaking truthfully with a representative of plaintiff and testifying truthfully at any Court hearing . . . regarding Wayne Haselhuhn's knowledge of the circumstances surrounding the death of Juana Rolenc"; and (3) the State, in consideration of Haselhuhn's performance under the agreement, would present no evidence of aggravating circumstances and would recommend life imprisonment at his sentencing.

As we stated in *State v. Irish*, 223 Neb. 578, 391 N.W.2d 137 (1986), determinations as to the qualifications of a person to be a witness or the admissibility of evidence are matters left to the sound discretion of the trial court, whose rulings will not be upset absent an abuse of discretion.

Burchett points to the testimony of Haselhuhn's attorney, Kirk Naylor, Jr., as support for his argument that Haselhuhn's plea agreement forced him to testify to certain events, regardless of the truth. Naylor testified that Haselhuhn had in fact given law enforcement officials several different versions of his involvement in the killing when the matter was first investigated. The final version implicating Burchett was understood by Naylor and the prosecutor to be truthful for purposes of the plea agreement. Naylor testified that there was no discussion regarding what would happen if Haselhuhn failed to testify in conformance with this final statement.

The Lancaster County attorney, Michael Heavican, testified that his office would determine if Haselhuhn's testimony at trial was in fact truthful. To make this determination Haselhuhn's

testimony was to be compared to other evidence, and possibly his previous statements. While he would have been surprised by Haselhuhn's testimony if it absolved Burchett of fault in the killing, Heavican testified that he would look at all the facts to determine if such testimony violated the agreement. According to Naylor, the plea agreement was not conditioned upon a jury verdict against Burchett.

While there was question concerning Haselhuhn's credibility, there is no clear showing that the plea agreement required anything but truthful testimony on his part. As such, Haselhuhn's testimony was not so tainted as to require its preclusion.

Burchett contends that the trial court erred in failing to dismiss the information filed against him because it is unconstitutional to charge a capital offense except by presentment or indictment of a grand jury. This court has addressed the same or similar arguments on several occasions. In those cases we have determined that prosecutions for felonies, including murder, may be had on informations filed by the county attorney. *Jackson v. Olson*, 146 Neb. 885, 22 N.W.2d 124 (1946); *Hawkins v. State*, 60 Neb. 380, 83 N.W. 198 (1900); *Bolln v. State*, 51 Neb. 581, 71 N.W. 444 (1897), *aff'd* 176 U.S. 83, 20 S. Ct. 287, 44 L. Ed. 382 (1900). Further, it is clear that such a procedure violates neither the 14th amendment to the federal Constitution nor the due process clause of the Nebraska Constitution. *Bolln v. State, supra; Hurtado v. California*, 110 U.S. 516, 4 S. Ct. 111, 28 L. Ed. 232 (1884); *State v. Lehman*, 203 Neb. 341, 278 N.W.2d 610 (1979); *Jackson v. Olson, supra.*

There being no error, the judgment is affirmed.

AFFIRMED.