STATE OF NEBRASKA, APPELLEE, V. MOHAMED EL-TABECH, APPELLANT.

405 N.W.2d 585

Filed May 15, 1987.    No. 86-065.

Dennis R. Keefe, Lancaster County Public Defender, and Michael D. Gooch, for appellant.

Robert M. Spire, Attorney General, and William L. Howland, for appellee.

KRIVOSHA, C.J., BOSLAUGH, WHITE, HASTINGS, CAPORALE, SHANAHAN, and GRANT, JJ.

PER CURIAM.

The appellant, Mohamed El-Tabech, was found guilty of murder in the first degree, in violation of Neb. Rev. Stat. § 28-303(1) (Reissue 1985), and use of a deadly weapon to commit a felony, in violation of Neb. Rev. Stat. § 28-1205(1) (Reissue 1985). He was sentenced to life imprisonment for the first degree murder conviction and 20 years' imprisonment for the use of a deadly weapon conviction, the sentence on the second conviction to run consecutively to the first conviction. He has now appealed to this court, specifically assigning as error the following:

I.

Whether a defendant is entitled to an untrammeled attorney/client relationship.

II.

Whether the defendant is entitled to some additional community input into the life-death decision beyond a petit jury verdict on the issues of guilt-innocence.

III.

Whether the evidence was sufficient to support a conviction for murder in the first degree?

IV.

Whether the defendant is entitled to have his jury

correctly instructed, pursuant to a Nebraska Jury Instruction, on his theory of the defense, if that defense is supported by evidence in the record?

V.

Whether the trial court violated the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution by death qualifying a jury in a capital case where the jury has absolutely nothing to do with punishment?

VI.

Whether the trial court violated Article I, Section 6 of the Constitution of the State of Nebraska by death qualifying the jury in a capital case when the jury has absolutely nothing to do with punishment?

VII.

Whether the trial court abused its discretion in death qualifying the jury?

We believe that none of the assignments of error entitle El-Tabech to a new trial, and, for that reason, we affirm the convictions and sentences.

On June 24, 1984, in response to a 911 emergency call, police and emergency personnel were dispatched to a home in Lincoln, Nebraska. Linda Woodruff, a paramedic employed by Eastern Ambulance Service, was the first to arrive at the scene. Upon entering the house, she observed El-Tabech seated on the floor, rocking back and forth and pointing to the back of the house.

El-Tabech's wife, Lynn El-Tabech, was found lying on a bed with a white terry cloth bathrobe belt tied tightly around her neck. Both the condition and temperature of her body indicated that she had not been dead for very long. Woodruff unsuccessfully attempted to untie the belt and then obtained scissors from the ambulance and cut the belt from around the decedent's neck. Shortly thereafter other emergency personnel and the police arrived.

There was testimony from various witnesses regarding alleged remarks made by El-Tabech at that time. Woodruff recalled that she heard El-Tabech say, "Don't take me to jail" as he was being taken to a police car. Lieutenant Soukup of the

Lincoln Police Department heard El-Tabech say, "Who will take care of me now?" while he was on the porch of the residence. Sharon Hebbard, a neighbor who was 150 feet away from the El-Tabech porch, testified she heard El-Tabech say, "I didn't mean to" or "I didn't mean to do it." Officer Sims of the Lincoln Police Department, who transported El-Tabech to the police station and observed him, heard him say, "Do you got whoever did that?" and "I swear I'll kill them."

In investigating the crime the State produced the following evidence. The neighbor, Sharon Hebbard, claimed to have overheard an argument at the El-Tabech residence around 11 a.m. or noon on the day that Ms. El-Tabech was murdered. Hebbard testified that, while seated on the porch with her husband, she heard a 30-minute argument going on at the El-Tabech residence. Hebbard remembered hearing a woman's voice say, "Leave me alone" and "Don't touch me." Hebbard's testimony was corroborated by her husband, who had also overheard the arguing.

David James, a member of the Mormon church that Mr. El-Tabech attended, testified that he spoke with El-Tabech at about 3 p.m. on the day of the murder. El-Tabech called the church, where James was in meetings. According to James, El-Tabech was quite upset and asked James if James would come right over and talk with him and the decedent. When James told him that he could not make it until later, El-Tabech advised James that he and the decedent were having troubles. Specifically, James said he heard the decedent in the background say something to the effect of "I'm leaving. I'm going for a walk." El-Tabech then said, "Well, when will you be back?" and the decedent said, "I don't know." Then, El-Tabech said to James, "Well, she's leaving me."

A waitress at a Village Inn Restaurant in Lincoln testified that she arrived at work at 4 p.m. on the day of the murder. She recalled that she waited on El-Tabech, who was dining with a woman, at about 5:30 p.m. She was able to ascertain this by reason of the computer at the restaurant, which prints the date and time an order is presented to the kitchen cooks. The waitress testified that the time printed on the ticket reflecting El-Tabech's order was 5:36 p.m. She testified she heard the

couple arguing when she took their food to their table. Specifically, she testified, "He said, 'You never tell me where you're going. I have a right to know where you are.' " She further testified that the statements were made in an angry, loud voice. When she returned to the table at approximately 6 p.m. to pick up their meal plates, El-Tabech apologized to the waitress for his loud voice, saying, "Excuse me for my voice. Married life is not easy." According to the waitress, when she clocked out on break at 6:07 p.m., El-Tabech and the woman were still in the restaurant. When she returned from break at 6:41 p.m., El-Tabech and his companion were no longer in the restaurant.

The State also called Gertrude Makovicka, a neighbor of El-Tabech's. She and her husband returned home from an afternoon of visiting at approximately 5:30 p.m. on the day of the murder. At 6 p.m. she and her husband started watching "60 Minutes." She testified that they watched the show until its completion at 7 p.m. During part of the time she was working in the kitchen, washing strawberries. She could both see the TV set and observe the El-Tabech residence from the kitchen. She testified that she saw the El-Tabechs arrive home at about 6:15 p.m. She further testified that shortly after 7 p.m. she went out on her porch. After she had been sitting outside for 5 to 10 minutes, she observed El-Tabech come out of his house. He got into his car, drove up to Vine Street, and then turned onto Vine, heading west. She remained on her porch and approximately 10 minutes later observed El-Tabech return with a small package. During the time that he was gone, Makovicka testified she did not see anybody go into or come out of the El-Tabech residence. About 5 minutes after El-Tabech arrived back at his residence, Makovicka saw the first emergency vehicle arrive.

Rhonda James, wife of David James, testified that she spoke to El-Tabech on the phone just before 6:30 p.m. She took the phone call at the church. She testified that El-Tabech "sounded upset, and he wanted to visit with [her husband]." El-Tabech asked that her husband come right by on his way home. She said she would relay the message to her husband but, in fact, did not tell him until after the family had gotten home from church.

James attempted to call El-Tabech around 7 p.m., but no one

answered the phone.

An employee at the Save-Mart grocery, located at 45th and Vine Streets, testified that on June 24, 1984, she was working on cash register No. 5. When a person makes a purchase, the cash register prints on the receipt what was purchased, the amount, the date, the time, and the check stand number. While she did not remember a particular purchase of ice cream bars at 7:23 p.m. on the evening of the murder, the receipt in evidence indicates that such a purchase did take place at that time.

The decedent's father, Elmer Prusia, testified that he started trying to call his daughter on the telephone shortly after 5:30 p.m. on June 24, 1984. He had received a call for her on his own phone at about 5:25 p.m. The caller had left a message which Prusia was attempting to relay to his daughter. When he did not get an initial answer, he intermittently redialed his daughter's number while watching television. Finally, at about 7:35 p.m., he got a busy signal. When he called again at 7:50 or 7:55 p.m., the phone was answered by emergency personnel.

The decedent's mother described El-Tabech as very attentive for the affection of her daughter. She further testified to an incident which had occurred on Memorial Day, when El-Tabech had been particularly upset that the decedent was not wearing her wedding ring. The decedent's mother also testified that on Father's Day preceding the day of the killing, her daughter and El-Tabech had advised them that they were expecting a child. The mother further corroborated the testimony of the decedent's father with regard to his attempts to reach his daughter by phone.

The decedent's sister was also called and testified. Specifically, she testified with regard to the announcement of her sister's pregnancy. El-Tabech insisted that no one was to know about the pregnancy and was quoted as saying, "Who knows what may happen in the next few months." The decedent's sister also testified with regard to her observations concerning El-Tabech's demeanor and her concerns over his view of women generally. The sister testified that El-Tabech was against his wife's wearing makeup and that he tended to have aggressive behavior toward her. She also testified that over the course of the 6 months of the marriage, the decedent had, on a

number of occasions, indicated that she did not favor the attention that was being bestowed upon her and, in fact, had specifically informed El-Tabech to "[l]eave me alone." The decedent's sister further testified that it was her observation that the decedent had become more and more concerned with the attention from her husband and that she had in some ways "withdrawn." This testimony was corroborated by the sister's husband.

El-Tabech called Khalil Chehab as a witness for the defense. Chehab testified that he had known El-Tabech since high school in Lebanon. At the time of the trial he had not seen El-Tabech in 8 or 9 years. However, during the summer of 1983, while on a visit to Lebanon, he had learned that El-Tabech was in the United States. He obtained El-Tabech's phone number and address. Upon his return from Lebanon to California, he made a phone call and spoke with the decedent. In March or April of 1984, he received a letter from El-Tabech in which he was informed of the new telephone number for the El-Tabechs.

He then testified that on June 24, 1984, he was working at a Taco Bell restaurant in California. He was scheduled to work from 11 a.m. until 5 p.m., but was told by the manager to take off work at 4 p.m. He testified that after he got off work at 4 p.m., he called his wife from a pay telephone inside the Taco Bell, but she was not at home. He stayed in the restaurant, had something to eat, and then decided to call his parents in Lebanon. The reasons he gave for calling Lebanon from a pay phone were that he did not want his wife to know about it and he wanted to be able to prevent his mother from talking too long.

He testified that he made this overseas call to his mother at about 5 p.m. California time, or 7 p.m. local time. During this phone call he received a message for El-Tabech. When he got off the phone, he again tried to call his wife but still received no answer. According to Chehab this was a little after 5 p.m. California time. He then decided to call El-Tabech and give him the message. He claims that he called the El-Tabech number and a woman who identified herself as the decedent answered. He asked for El-Tabech but was unable to speak with him. He then testified that he asked to and did leave a message for El-Tabech

with the woman who answered the phone. After this phone call, he again called his wife and she answered. Within a few minutes she picked him up, and the couple went shopping.

On cross-examination, Chehab stated that he remembered the events of that day because of his call to Lebanon and an argument he had with his wife. He did admit, however, that he was not wearing a wristwatch on the day in question and that he was estimating the times. With these facts in mind, we now review El-Tabech's assignments of error.

I.

*Whether a defendant is entitled to an untrammeled attorney/client relationship.*

While assignment of error No. 1 seems somewhat obscure, in essence, El-Tabech maintains that the district court committed error when it disqualified his court-appointed public defender and appointed private counsel to represent him.

The record reflects that the public defender was initially appointed to represent El-Tabech on the criminal charges. Specifically, Scott P. Helvie was assigned from the public defender's office to represent El-Tabech. He began this representation in June of 1984. At the same time Helvie represented an individual by the name of Robin Burchett, who had also been charged with murder in the first degree.

On April 29, 1985, Helvie received a call from Burchett. In that phone conversation, Burchett claimed that while both Burchett and El-Tabech were confined in the Lancaster County jail, El-Tabech confessed to Burchett that he, El-Tabech, had killed his wife. Apparently, Burchett had inquired of Helvie what he, Burchett, might get as a favor from the State in his case in return for giving testimony about the killing in the El-Tabech case. Helvie advised Burchett that it was not likely that he could get anything in return for the testimony.

Subsequently, in May of 1985, a detective from the Lincoln Police Department interviewed Burchett and another prisoner, who informed the detective that El-Tabech admitted to them that he had killed his wife. Burchett was then endorsed as a witness in the El-Tabech case.

The State, being concerned that Helvie might not be able to effectively cross-examine Burchett, thereby giving El-Tabech

grounds for an appeal because of ineffective assistance of counsel, moved, in effect, to disqualify Helvie as appointed counsel. One of the apparent concerns was that in the event that Burchett testified about his conversation with El-Tabech and maintained that he was coming forward simply as a concerned citizen, Helvie would not be able to question him as to whether he had not first inquired of Helvie whether he might not trade that information for a favor in his case, the information having come to Helvie from Burchett in the first instance, in a confidential communication between attorney and client.

The trial court, in an apparent abundance of caution, concerned that either a mistrial might subsequently be declared or the entire trial be subject to appeal on the grounds of conflict of interest, sustained the State's motion and appointed competent, experienced private counsel at State expense for El-Tabech. Nowhere in appellant's brief does El-Tabech tell us how he was adversely affected by this event or how newly appointed counsel failed to effectively represent El-Tabech. No claim is made that counsel appointed by the court was ineffective or that, by reason of the appointment, El-Tabech was denied an opportunity to present relative evidence. The argument which is made is simply that Helvie was El-Tabech's original lawyer who had spent a great deal of time in preparation for trial and who should have been permitted to continue.

Counsel for El-Tabech argues that there are only two reasons to hold a hearing regarding a conflict of interest. The first reason is to determine whether in fact a conflict of interest exists that is severe enough to endanger the defendant's sixth amendment right to effective assistance of counsel, and the second reason is to determine whether disqualification is the appropriate remedy for the conflict. There is, of course, a third reason. That is to ensure that potential errors, which might give rise to an appeal or deny El-Tabech an adequate trial, be eliminated if at all possible. And, in that regard, where the problem becomes apparent before the actual trial, the trial court must be given broad discretion in determining whether such a conflict might exist and whether disqualification is the appropriate remedy.

In the case of *United States v. Agosto*, 675 F.2d 965, 970 (8th

Cir. 1982), the court said:

> Here, we are concerned with the power of the district court to disqualify counsel *before* conflict results in ineffective assistance of counsel. At this stage in the proceedings, there is of necessity less certainty as to whether conflicts will actually arise and as to the nature of those conflicts. This is particularly so where the government files a motion for disqualification early in the proceedings.
>
> Because the task of assessing the potential for conflict well in advance of trial is such a difficult one, the standards applicable to making that assessment must be flexible.

(Emphasis in original.)

Certainly, there was the potential for a conflict of interest. See *State v. Turner*, 218 Neb. 125, 354 N.W.2d 617 (1984). Moreover, as noted by appellant, while El-Tabech has a sixth amendment right to effective assistance of counsel, where counsel is court-appointed, the defendant does not have a constitutional right to counsel of his choice. See *State v. Blunt*, 197 Neb. 82, 246 N.W.2d 727 (1976). There is simply no evidence in this record to indicate that El-Tabech did not receive effective assistance of counsel or that the district court abused its discretion in disqualifying Helvie once the information concerning the potential conflict of interest was brought to the district court's attention. On the basis of the record presented to us in this case, there is no evidence that El-Tabech was in any way prejudiced by reason of the district court's order disqualifying Helvie and appointing other counsel well in advance of trial. Nor is there evidence that El-Tabech was denied any constitutionally guaranteed right. The first assignment of error must therefore be overruled.

## II.

*Whether the defendant is entitled to some additional community input into the life-death decision beyond a petit jury verdict on the issues of guilt-innocence.*

Appellant's second assignment of error, though again couched in broad terms, is to the effect that proceeding against the appellant by information rather than by grand jury denied

El-Tabech his constitutionally guaranteed rights. We have recently reaffirmed our rejection of this charge. In *State v. Burchett*, 224 Neb. 444, 457, 399 N.W.2d 258, 267 (1986), we said:

> [W]e have determined that prosecutions for felonies, including murder, may be had on informations filed by the county attorney. *Jackson v. Olson*, 146 Neb. 885, 22 N.W.2d 124 (1946); *Hawkins v. State*, 60 Neb. 380, 83 N.W. 198 (1900); *Bolln v. State*, 51 Neb. 581, 71 N.W. 444 (1897), *aff'd* 176 U.S. 83, 20 S. Ct. 287, 44 L. Ed 382 (1900).

We are not disposed to depart from that position, and, therefore, the second assignment of error must likewise be overruled.

### III.

*Whether the evidence was sufficient to support a conviction for murder in the first degree?*

El-Tabech argues that the case was entirely based on circumstantial evidence, and, therefore, the verdict cannot stand. We believe that such is not the case. To begin with, the Supreme Court will not resolve conflicts in the evidence, pass on the credibility of witnesses, determine the plausibility of explanations, or weigh the evidence. Such matters are for the trier of fact, and the verdict must be sustained if, taking the view most favorable to the State, there is sufficient evidence to support it. See, *State v. Ellis*, 223 Neb. 779, 393 N.W.2d 719 (1986); *State v. Rolling*, 209 Neb. 243, 307 N.W.2d 123 (1981); *State v. Joy*, 220 Neb. 535, 371 N.W.2d 113 (1985). Furthermore, the fact that the evidence convicting El-Tabech is circumstantial does not make it any less reliable. One accused of a crime may be convicted on the basis of circumstantial evidence if, taken as a whole, the evidence establishes guilt beyond a reasonable doubt. The State is not required to disprove every hypothesis but that of guilt. See *State v. Buchanan*, 210 Neb. 20, 312 N.W.2d 684 (1981).

Viewing the evidence most favorable to the State, as we are required to do in processing this appeal, we believe that the jury could find El-Tabech guilty of murder in the first degree beyond a reasonable doubt. To begin with, two facts are without

dispute. The first was that the decedent was murdered, and the second was that she died by strangulation on June 24, 1984, sometime between 6:15 and 7:30 p.m. Furthermore, there is no dispute that El-Tabech and the deceased were quarreling and that the deceased had advised El-Tabech that she was leaving. This information was both conveyed to the friend, David James, and observed by the waitress.

Moreover, the evidence is without dispute that just before 6:30 p.m., the decedent was still alive, having been seen by the neighbor. Additionally, El-Tabech was seen leaving the residence shortly after 7 p.m. Shortly thereafter, the decedent was found by the emergency personnel with the bathrobe belt tied around her neck. No one was observed entering the residence during El-Tabech's absence, nor does the evidence reveal that there were any visible signs of forced entry or robbery.

The jury could reasonably conclude that El-Tabech and the decedent had a domestic argument and that El-Tabech strangled his wife and thereafter left the residence, only to return shortly thereafter to report the homicide. The State argued, and the jury apparently chose to believe, that the process of strangulation was time consuming and supported a finding of intent, premeditation, and deliberation. We cannot say, as a matter of law, that the evidence was not sufficient for the jury to find El-Tabech guilty beyond a reasonable doubt. The assignment of error must be overruled.

IV.

*Whether the defendant is entitled to have his jury correctly instructed, pursuant to a Nebraska Jury Instruction, on his theory of the defense, if that defense is supported by evidence in the record?*

In essence what this assignment of error addresses is the question of whether prejudicial error was committed by the court when it refused to instruct the jury on the question of alibi. At the close of all of the evidence, El-Tabech submitted a proposed instruction providing as follows:

The defendant contends that at or about the time the crimes with which the defendant stands charged were allegedly being committed the defendant was at such a

distant and different place that he could not have committed said crimes.

The defendant is not required to prove such defense. It is sufficient if the evidence raises a reasonable doubt in your minds as to his presence at the time and place the crimes are alleged to have been committed; and if from all the evidence in the case you are not satisfied beyond a reasonable doubt of defendant's presence at the commission of the crimes charged against him, then you should find him not guilty.

We believe that there are at least two reasons why the district court's refusal to give the requested instruction was not error. In the first instance, alibi in Nebraska is not an affirmative defense. In the case of *Hall v. State*, 135 Neb. 188, 191, 280 N.W. 847, 848 (1938), this court said:

While the holdings in all of the courts cannot be reconciled, yet the majority of the courts hold that alibi evidence is not to be considered by itself, but in connection with all the other evidence, and that alibi is not an independent affirmative defense in the same sense that insanity is regarded as an affirmative defense. Annotation, 67 A.L.R. 138. Therefore, it was not error for the court to fail to give the jury an instruction on alibi.

Recent court decisions elsewhere have also determined that alibi is not an affirmative defense. The U.S. Court of Appeals for the Fourth Circuit, in *Adkins v. Bordenkircher*, 674 F.2d 279, 282 (4th Cir. 1982), observed:

An alibi, however, negates *every* fact necessary to prove a breaking and entering; the defendant could not commit the offense if he was elsewhere at the time. When viewed under the *Patterson* standard, the West Virginia court's characterization of the alibi as an affirmative defense must be rejected.

(Emphasis in original.)

Likewise, the Supreme Court of Hawaii, in the case of *State v. Cordeira*, ____ Haw. ____, ____, 707 P.2d 373, 376 (1985), said:

In the context of a criminal prosecution, "alibi" denotes an attempt by the defendant to demonstrate he

"did not commit the crime because, at the time, he was in another place so far away, or in a situation preventing his doing the thing charged against him." [Citation omitted.] "Strictly speaking, *alibi evidence* is merely rebuttal evidence directed to that part of the state's evidence which tends to identify the defendant as the person who committed the alleged crime." *Witt v. State*, 205 Ind. 499, 503, 185 N.E. 645, 647 (1933). (Emphasis added.) Though Rule 12.1 of the Hawaii Rules of Penal Procedure requires the defendant to give notice of an intention to rely upon the defense of alibi, it is not an affirmative defense.

And, in *Wright v. State*, 169 Ga. App. 693, 697, 314 S.E.2d 709, 712 (1984), the court said:

Although alibi has often been treated as an affirmative defense, it "is not truly an independent affirmative defense. It is simply evidence in support of a defendant's plea of not guilty, and should be treated merely as 'evidence tending to disprove one of the essential factors in the case of the prosecution, that is, presence of the defendant at the time and place of the alleged crime.' " *Parham v. State*, 120 Ga. App. 723, 727 (171 SE2d 911) (1969); accord, *Rivers v. State*, 250 Ga. 288 (298 SE2d 10) (1982).

In the instant case the jury was instructed that the State had the burden of proving each and every element of the crime, including the fact that the accused committed the act as charged. The failure to instruct the jury on the alibi did not relieve the State of its full burden of proof.

Secondly, the evidence in the instant case was not sufficient to justify the giving of an instruction on alibi. In the early case of *Mays v. State*, 72 Neb. 723, 725, 101 N.W. 979, 980 (1904), this court said:

"A defendant, to establish an *alibi*, must not only show he was present at some other place about the time of the alleged crime, but also that he was at such other place such a length of time that it was impossible for him to have been at the place where the crime was committed, either before or after the time he was at such other place." [Citation omitted.]

(Emphasis in original.) See *State v. Sutton*, 220 Neb. 128, 368 N.W.2d 492 (1985).

Other courts which have reviewed this issue have reached the same conclusion. See, *Greenhow v. United States*, 490 A.2d 1130 (D.C. 1985); *People v. Fritz*, 84 Ill. 2d 72, 417 N.E.2d 612 (1981); *State v. Gillespie*, 163 N.W.2d 922 (Iowa 1969).

El-Tabech's defense or alibi was that between 7 and 7:30 p.m. he was out of the house purchasing ice cream and therefore could not have committed the murder. The State, however, produced evidence that the murder occurred sometime between 6:15 and 7:30 p.m., and, therefore, it was possible for the jury to find that El-Tabech had committed the murder before he left the home to purchase the ice cream. It was therefore not error for the court to refuse to give the instruction on alibi.

## V.

*Whether the trial court violated the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution by death qualifying a jury in a capital case where the jury has absolutely nothing to do with punishment?*

## VI.

*Whether the trial court violated Article I, Section 6 of the Constitution of the State of Nebraska by death qualifying the jury in a capital case when the jury has absolutely nothing to do with punishment?*

## VII.

*Whether the trial court abused its discretion in death qualifying the jury?*

The last three assignments of error can be discussed together. Each of the above assignments of error was recently considered by this court in *State v. Burchett*, 224 Neb. 444, 399 N.W.2d 258 (1986), and rejected. In *State v. Burchett, supra* at 452, 399 N.W.2d at 264, we held that any argument that a "death-qualified" jury is partial or biased must fail because " 'an impartial *jury* consists of nothing more than "*jurors* who will conscientiously apply the law and find the facts." ' " (Emphasis in original.) Citing *Lockhart v. McCree*, 476 U.S. 162, 106 S. Ct. 1758, 90 L. Ed. 2d 137 (1986).

We further said in *Burchett, supra* at 450-51, 399 N.W.2d at

263:

While a prospective juror's attitudes about capital punishment are irrelevant to sentencing in Nebraska, they may be relevant to his ability to fairly determine the defendant's guilt or innocence. Prospective jurors who are excused because they are unable either to fairly determine guilt or to fairly impose a sentence because of their opposition to capital punishment are both subsets of the group of death penalty opponents which the defendant maintains is a cognizable group. The U.S. Supreme Court rejected the cognizable group claim in *McCree, supra*, and we do the same.

Having thus examined and rejected each of appellant's assignments of error, the judgment and sentences of the district court are affirmed.

AFFIRMED.