Jesse SEWELL, Appellant–
Petitioner Below,

v.

STATE of Indiana, Appellee–
Respondent Below.

No. 02A03–9110–PC–329.

Court of Appeals of Indiana,
Third District.

May 26, 1992.

Transfer Denied July 16, 1992.

Lee A. Smith, Indianapolis, for appellant.

Linley E. Pearson, Atty. Gen., Geoff Davis, Deputy Atty. Gen., Indianapolis, for appellee.

STATON, Judge.

Jesse Sewell appeals the denial of his post-conviction discovery motions. He presents two issues for our review:

    I. Whether the trial court erroneously refused to order the release of State's Exhibit 4 (a "rape kit") for laboratory examination and potential subjection to DNA testing.

    II. Whether the trial court erroneously refused Sewell's motion to examine

laboratory reports compiled by a State witness.

We reverse.

On December 22, 1981, Sewell was found guilty of rape, a Class B felony.[1] The conviction was affirmed on direct appeal, sufficient evidence having been established by victim identification. *Sewell v. State* (1982), Ind.App., 440 N.E.2d 1158. On February 26, 1985, Sewell filed a petition for post-conviction relief. On December 11, 1990, he filed two discovery motions.

Hearing on Sewell's discovery motions was held on March 11, 1991. Sewell requested access to two items of evidence allegedly within the State's possession: State's Exhibit 4, a "rape kit," and laboratory records allegedly disclosing the rapist's bloodtype.[2] Sewell indicated a desire to obtain potentially exculpatory blood type and DNA comparisons to support his claim for post-conviction relief.[3] The State opposed the motions, asserting an interest in the finality of judgments and the avoidance of unnecessary testing costs.

The trial court denied Sewell's discovery motions but certified the order for interlocutory appeal. On January 2, 1992, this court accepted jurisdiction of Sewell's interlocutory appeal pursuant to Ind. Appellate Rule 4(B)(6).

I.

### Discovery for DNA Comparison

IND.CODE 35-37-4-13(a) defines forensic DNA analysis as "an identification process in which the unique genetic code of an individual that is carried by the individual's deoxyribonucleic acid (DNA) is compared to genetic codes carried in DNA found in bodily substance samples obtained by a law enforcement agency in the exer-

---

1. IND.CODE 35-42-4-1.

2. No determination was made at the hearing as to whether the rape kit and laboratory report were still in existence. The trial court indicated that items of evidence were normally retained "downstairs" and untouched. However, the court declined to issue an order preventing destruction of the requested items pending appeal of the instant interlocutory order. Record, pp.

61–62. On January 2, 1992, this court directed the trial court to issue an order preserving all evidence relevant to Sewell's trial pending the completion of post-conviction proceedings.

3. No blood sample was obtained from Sewell at the time of his trial. Sewell alleges that he and his trial counsel disagreed concerning the need for a blood type comparison.

cise of the law enforcement agency's investigative function."

I.C. 35–37–4–13(b) provides for admission of DNA results in a criminal trial or hearing without antecedent expert testimony. Sewell contends that the incriminatory potential of DNA comparisons has been routinely recognized; the corollary exculpatory potential should be presumed. *See Davidson v. State* (1991), Ind., 580 N.E.2d 238; *Hopkins v. State* (1991), Ind., 579 N.E.2d 1297.

Sewell predicates his request for DNA comparisons upon dual grounds. First, he relies upon the language of Ind. Post–Conviction Rule 1 § 5, which specifically provides that pre-trial and discovery procedures are available to the parties in post-conviction proceedings. Sewell suggests that this rule renders any relevant evidence within the State's possession discoverable. Secondly, he argues that principles of fundamental fairness demand the State's release of requested evidence when its exculpatory potential is discovered, citing *Brady v. Maryland* (1963), 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215.

■ Although the post-conviction rules provide for discovery, a post-conviction proceeding is not a normal civil action. It is a special quasi-civil remedy designed for the presentation of errors unknown or unavailable at the time of trial or direct appeal. *Mickens v. State* (1991), Ind.App., 579 N.E.2d 615, 618. Because post-conviction proceedings take place *after* trial or a guilty plea hearing, the convicted individual typically has discovered particular items of State evidence or foregone the opportunity to do so. Discovery is not required under the due process clause of the Constitution; therefore, a defendant may waive pre-trial discovery rights by failing to exercise them. *Kindred v. State* (1989), Ind., 540 N.E.2d 1161, 1175. A second opportunity to discover the *same* evidence will typically be precluded.

■ Here, however, the parties agree that DNA comparisons were unavailable to Sewell at the time of his trial. A finding of waiver would be equivalent to requiring that a defendant anticipate forensic science advances. Moreover, the *Brady* rule can operate to require disclosure of evidence not otherwise discoverable.[4] We have found no Indiana case addressing a post-conviction petitioner's *Brady* claim to DNA comparisons. However, courts of other jurisdictions have considered the implications of *Brady* when the exculpatory potential of evidence is first discovered *after* trial.

In *State v. Thomas* (1991), 245 N.J.Super. 428, 586 A.2d 250, Thomas appealed an order denying his request for a DNA comparison following his conviction for the kidnapping and rape of two teenage girls. The State's case rested upon victim identification; each of the teenagers identified Thomas as the rapist. Thomas first moved for release of the "rape kit" exhibits after conviction. The State argued that defense counsel had made a binding strategic decision to forego examination of the "rape kits." This argument was rejected by the court:

> "It is clear that ordinarily a criminal defendant will be bound by strategic choices. But ... relief must be afforded from tactical errors which 'cut mortally into the substantive rights of the defendant.' ... [W]e can conceive of no greater injustice, when the evidence is available, of depriving a convicted defendant of access to it. The prosecutor, the court, and the judicial system have an obligation to protect the innocent which is no less fundamental than the obligation to punish the guilty.

> .    .    .    .    .

This recent literature leaves little doubt of the enormous utility of DNA testing, suggesting that the time may be close at hand when genetic blueprint evidence

---

**4.** Ordinarily, when discovery of criminal evidence is sought, the trial court is vested with discretion to weigh the defendant's interest in discovery against the State's interest in nondisclosure. *Sturgill v. State* (1986), Ind.App., 497 N.E.2d 1070, 1072, *reh. denied.* However, where the specified evidence is exculpatory, the defendant's right to fundamental due process outweighs the State's interest in nondisclosure. *Brady, supra.*

will be as routine and decisive as fingerprint evidence, and suggesting further that the State's failure to submit material to DNA testing may well implicate its obligation to reveal exculpatory evidence. *See Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963).

.      .      .      .      .

The orderly processing of cases through the court is an important value, but it is not the end in itself. It is only the method by which we attempt to achieve the ultimate purpose of the criminal justice system—the fair conviction of the guilty and the protection of the innocent. That is what our constitutional guarantees are all about. Our system fails every time the innocent person is convicted, no matter how meticulously the procedural requirements governing criminal trials are followed.

.      .      .      .      .

The precedent we create here, if any, is that in a criminal case, when the State's proofs are weak, when the record supports at least a reasonable doubt of guilt, and when there exists a way to establish guilt or innocence once and for all, we will not elevate form so highly over substance that fundamental justice is sacrificed."

*Id.* 586 A.2d at 252–54.

In considering a post-appeal action to compel the release of physical evidence for DNA testing, the New York Superior Court concluded that State interest in finality of judgments must yield to the due process requirement of State disclosure of exculpatory evidence. *In The Matter of Dabbs v. Vergari* (Sup.Ct.1990), 149 Misc.2d 844, 570 N.Y.S.2d 765. The State argued that Dabbs failed to establish the likelihood of a favorable test result and urged avoidance of a precedent whereby convicted rapists might routinely demand release of rape kits for DNA comparisons.

The court declined to impose upon a petitioner the burden of demonstrating sample viability before testing, opining: "The Courts, as well as the prosecution, must be vigilant to correct a mistake." *Id.* 570 N.Y.S.2d at 769. Observing that the purpose of *Brady* is to ensure that a miscarriage of justice does not occur, the court concluded that preserved evidence having a high exculpatory potential should be discoverable after conviction. *Id.* 570 N.Y.S.2d at 767–68. Accord: *People v. Callace* (Co.Ct.1991), 151 Misc.2d 464, 573 N.Y.S.2d 137.

While the above-referenced decisions are not binding on this court, we find the analysis of fundamental fairness issues relative to DNA testing persuasive. Advances in technology may yield potential for exculpation where none previously existed. The primary goals of the court when confronted with a request for the use of a particular discovery device are the facilitation of the administration of justice and the promotion of the orderly ascertainment of the truth. *State Ex. Rel. Grammer v. Tippecanoe Circuit Court* (1978), 268 Ind. 650, 653, 377 N.E.2d 1359, 1361. Moreover, where the State possesses exculpatory evidence, such evidence is discoverable notwithstanding a lack of strict compliance with normal discovery procedures.

Finally, we address the State's contention that allowing a DNA comparison in this case will encourage a flood of convicted rapists to clamor for forensic tests at State expense. We observe that only those petitioners misidentified at trial could benefit from a definitive identification procedure such as a DNA comparison. The potential for exculpation by DNA comparison parallels to the potential for accurate identification. Therefore, *Brady* is implicated in post-conviction requests for forensic tests only where a conviction rested largely upon identification evidence and advanced technology could definitively establish the accused's innocence.

## II.

### *Laboratory Reports*

Sewell concedes that he did not seek to discover the State's laboratory reports prior to trial, despite the availability of blood type comparisons at that time. However, we decline to find waiver in Sewell's lack of pretrial pursuit of the reports, due to the

enhanced exculpatory potential of the requested laboratory reports when examined in conjunction with a DNA comparison. Permitting the discovery of the laboratory reports would promote the orderly ascertainment of truth under the circumstances of the present case. The State has advanced no paramount interest in non-disclosure.

Reversed.

GARRARD and CONOVER, JJ., concur.