(902 P.2d 494)

No. 72,773

TYRONE M. MEBANE, *Appellant*, v. STATE OF KANSAS, *Appellee*.

Opinion filed August 25, 1995.

*Hazel Haupt* and *Rebecca E. Woodman*, assistant appellate defenders, and *Jessica R. Kunen*, chief appellate defender, for the appellant.

*Michael Grosko*, assistant district attorney, *Nick A. Tomasic*, district attorney, and *Carla J. Stovall*, attorney general, for the appellee.

Before BRAZIL, C.J., LEWIS, J., and JACK L. BURR, District Judge, assigned.

BURR, J.: This appeal arises from the district court's denial of a K.S.A. 60-1507 motion requesting DNA testing of rape kit evidence. Following a jury trial on October 10, 1985, Tyrone Mebane was convicted of one count each of aggravated burglary and rape and two counts each of aggravated kidnapping and aggravated criminal sodomy. Mebane was sentenced under the Habitual Criminal Act to 15 to 45 years for aggravated burglary, life for each count of aggravated kidnapping, 45 years to life for rape, and 45 years to life for each count of aggravated criminal sodomy. The

court ordered Mebane's sentences to run concurrently. These convictions were affirmed by the Kansas Supreme Court in *State v. Mebane*, No. 59,601, unpublished opinion filed March 27, 1987.

Mebane filed a K.S.A. 60-1507 motion requesting that DNA testing be performed, at the expense of the State, upon rape kit evidence. DNA testing was not available at the time of Mebane's trial. Mebane argues that this would produce exculpatory or newly discovered evidence which would entitle him to a new trial. Following a hearing, the trial court denied the motion, and this appeal was timely filed.

The facts surrounding Mebane's convictions may be summarized as follows: The victims, Marzay Tatum and L.M., were alone in a friend's apartment where they had consensual intercourse. They were sitting on the couch afterwards when Michael Ross fell through the front door, apparently after defendant had pushed him in the hallway. Tatum recognized defendant, Audie Suber, and Eddie Moore standing in the hallway. Ross apologized and all four men left. About 30 minutes later while L.M. was in the bathroom, the same four men kicked in the front door. The men ordered Tatum to lie on the floor and covered his head with a blanket. Tatum was held in that position at gunpoint for the next several hours and testified that he recognized the voices of defendant, Suber, Ross, and Moore.

Meanwhile, the men found L.M. in the bathroom, covered her face with a pillow or towel, and forced her to have vaginal and anal intercourse and to perform oral sex. After approximately an hour and a half, the men moved L.M. to the bedroom where they continued to rape and sodomize her. Before leaving, one of the men poured water in L.M.'s vagina three times. L.M. estimated that she was forced to have vaginal intercourse 10 or more times, anal sex 3 times, and oral sex 8 times. L.M. was not sure whether three or four men had attacked her and could not identify any of them.

After the attack, L.M. was taken to the hospital where a doctor performed a rape kit examination. Of the vaginal, anal, and oral swabs, seminal fluid was found on only the vaginal swab. Eventually, rape kit examinations were also performed upon Tatum and

all four suspects. Because there was more than one possible donor, testing of the seminal fluid did not exonerate any of the suspects.

Suber, Moore, and Ross all entered into plea bargains with the State and testified at Mebane's trial. Suber testified that Mebane was not involved in the attack on L.M.; however, Suber also testified that he knew nothing about the incident. He then admitted that he had been there and had robbed Tatum but continued to deny any knowledge of the attack on L.M. Moore and Ross testified that Mebane was involved and gave accounts of the attack which were mostly consistent with each other and with the victims' accounts, except that each claimed Suber forced his participation in the incident, and Moore denied having sex with L.M. Moore and Ross have since recanted their testimonies and have stated that Mebane was not involved.

In his K.S.A. 60-1507 motion, Mebane requested that the State pay for and allow DNA testing on preserved rape kit evidence. If the DNA testing were to produce favorable results, Mebane would then seek a new trial based on newly discovered evidence. Mebane argues that the district court erred by evaluating his motion under a newly discovered evidence standard. Instead, the district court should have construed his motion as one for discovery of potentially exculpatory evidence.

Mebane argues that he has a due process right to post-conviction discovery of DNA evidence under *Brady v. Maryland*, 373 U.S. 83, 87, 10 L. Ed. 2d 215, 83 S. Ct. 1194 (1963). While Kansas has not addressed the issue, several other states have recognized such a right under the logic of *Brady*.

The New York courts first addressed the issue in *Matter of Dabbs v. Vergari*, 149 Misc. 2d 844, 570 N.Y.S.2d 765 (1990). In *Dabbs*, the defendant was convicted of rape, and his conviction was affirmed on appeal. The defendant subsequently sought DNA testing of physical evidence as a prelude to a possible motion to vacate his conviction based on newly discovered evidence. DNA testing was not available at the time of the defendant's trial. 149 Misc. 2d at 846.

The *Dabbs* court granted the defendant's request for DNA testing, reasoning as follows:

"[A] defendant has a constitutional right to be informed of exculpatory information known to the State (*see generally, Brady v. Maryland,* 373 U.S. 83; [other citations omitted]). . . .

. . . .

"A corollary to the duty of disclosure is the duty to preserve exculpatory material [citations omitted] . . . .

"[C]ourts have dismissed indictments after convictions because of destruction or loss of evidence by the police when that police conduct has deprived a defendant of material of high exculpatory potential. [Citations omitted.]

"By a parity of reasoning, where evidence has been preserved which has high exculpatory potential, that evidence should be discoverable after conviction . . . .

. . . .

"[W]hile it is unclear what such testing will ultimately reveal, [defendant] has demonstrated an adequate foundation for the testing by showing that the victim's panties, a gauze pad and rape test slides have high exculpatory potential. . . . Assuming the sexual history as described [by the victim] to be true, any semen taken from the victim could only belong to her attacker. If DNA testing could exclude that semen as belonging to [defendant], it would strongly impeach the credibility of the victim's identification of [defendant]." 149 Misc. 2d at 847-49.

New York again addressed the issue of post-conviction discovery of DNA evidence in *People v. Callace,* 151 Misc. 2d 464, 573 N.Y.S.2d 137 (1991). In *Callace,* the defendant was convicted of several sex crimes and subsequently requested DNA testing of the physical evidence introduced at his trial. 151 Misc. 2d at 464-65. The *Callace* court granted the defendant's request but reached its conclusion by a different route than the *Dabbs* court.

The *Callace* court rejected the *Dabbs* analysis involving a defendant's right to discovery of exculpatory evidence; instead, the court found that "the better analogy is to an application for newly discovered evidence." 151 Misc. 2d at 467. The court found that the defendant's application for DNA testing was a prelude to the making of a motion to set aside the judgment on the basis of newly discovered evidence. The court reasoned that DNA evidence was newly discovered because it was unavailable at the time of the defendant's trial. Although no specific statutory authority existed for post-conviction discovery in connection with a motion to set aside the judgment, the court did have the authority to devise new procedures as necessary. 151 Misc. 2d at 466-67.

New Jersey has also considered the issue of a defendant's right to post-conviction DNA testing. In *State v. Thomas*, 245 N.J. Super. 428, 586 A.2d 250 (1991), the defendant requested DNA testing of rape kit evidence after his conviction but before sentencing. The *Thomas* court noted that the evidence against the defendant was not strong and that his defense was sufficient to raise a reasonable doubt as to his guilt. The court held:

"Under these circumstances, considerations of fundamental fairness demand that the [DNA] testing of this now seven-year old rape kit material be done now . . . .

. . . .

"The precedent we create here, if any, is that in a criminal case, when the State's proofs are weak, when the record supports at least a reasonable doubt of guilt, and when there exists a way to establish guilt or innocence once and for all, we will not elevate form so highly over substance that fundamental justice is sacrificed." 245 N.J. Super. at 434-36.

Indiana, too, has allowed a defendant to obtain rape kit evidence for DNA testing after his conviction. See *Sewell v. State*, 592 N.E.2d 705 (Ind. App. 1992). The *Sewell* court cited the reasoning of *Dabbs*, *Callace*, and *Thomas* in deciding to allow DNA testing. The court also addressed the State's concern that its decision would encourage a flood of convicted rapists to request DNA testing at the State's expense.

"We observe that only those petitioners misidentified at trial could benefit from a definitive identification procedure such as a DNA comparison. The potential for exculpation by DNA comparison parallels to the potential for accurate identification. Therefore, *Brady* is implicated in post-conviction requests for forensic tests only where a conviction rested largely upon identification evidence and advanced technology could definitively establish the accused's innocence." 592 N.E.2d at 708.

Turning to Kansas law, our appellate courts have not addressed the specific issue of a defendant's right to post-conviction discovery of DNA evidence. However, at least one case deserves mention. In *State v. Snodgrass*, 252 Kan. 253, 843 P.2d 720 (1992), the defense requested a continuance to allow time for DNA testing and requested that the State pay for such testing pursuant to K.S.A. 22-4508. The trial court denied the request, in part, because it was made only two days before trial. In affirming the trial court, the

*Snodgrass* court noted that "neither this court nor the United States Supreme Court has held that a criminal defendant has an unqualified right to DNA testing." 252 Kan. at 265. Further, the defendant had confessed, and the last minute request for DNA testing appeared to be "nothing more than a delaying tactic and fishing expedition." 252 Kan. at 265. The *Snodgrass* court did not address the possible implications of *Brady*.

By contrast, Pennsylvania has reversed a defendant's conviction on direct appeal based upon the State's failure to perform DNA testing despite the defendant's requests. See *Com. v. Brison*, 421 Pa. Super. 442, 618 A.2d 420 (1992). The *Brison* court cited *Dabbs, Callace, Thomas*, and *Sewell* in reaching its conclusion that the State should have performed DNA testing. The court then ordered that the tests be performed and that, upon receipt of the test results, the lower court determine whether the test results warranted a new trial. 421 Pa. Super. at 453.

In spite of the apparent difference between *Snodgrass* and *Brison*, it seems a matter of fundamental fairness that, under certain circumstances, a defendant be able to obtain post-conviction DNA testing. However, a blanket rule allowing any defendant to obtain post-conviction DNA testing at the State's expense would be overly broad. This court holds the request of Mebane to be in the nature of a motion for a new trial based on newly discovered evidence. Whether the request is viewed as an exculpatory evidence issue or as a newly discovered evidence issue, certain standards apply for use by trial courts in determining when a defendant should be allowed to obtain post-conviction DNA testing and how that testing should be funded.

Cases from other jurisdictions which have allowed post-conviction DNA testing have at least two main similarities. First, each case involved a single perpetrator, which would make DNA testing determinative of the guilt or innocence of the defendant. Second, the State's evidence in each case was weak or the defense was sufficient to support a reasonable doubt.

This case involves multiple semen donors. Consequently, the results of DNA testing would probably be inconclusive, and it is

highly unlikely that a positive determination of defendant's guilt or innocence could be made from the results of such test.

Mebane next contends that the evidence against him at trial was "weak." We disagree. At the original trial, conflicts in the testimony entered concerning the facts were resolved against Mebane. Mebane's convictions were affirmed on earlier appeal.

Since the earlier trial, Moore and Ross have recanted their earlier testimony and stated that Mebane was not involved in the attack. At the latest hearing, the trial court did not comment on the credibility of Moore's and Ross' most recent statements, but the court did indicate that the evidence presented against Mebane at trial was "overwhelming." The trial court was aware that Moore and Ross have recanted their earlier testimony, and this obviously did not change the opinion of the court.

Mebane alleges error by the trial court in evaluating his motion under the newly discovered evidence standard of *Taylor v. State*, 251 Kan. 272, 276-77, 834 P.2d 1325 (1992). The court concluded that Mebane failed to meet the newly discovered evidence test in that the evidence would not be likely to produce a different result at trial. Even under Mebane's proposed analysis of the issue as one involving potentially exculpatory evidence, the trial court must evaluate whether the evidence is, in fact, potentially exculpatory. In this case, the trial court found that the evidence did not have great exculpatory potential because the expectation would be that the results would be inconclusive due to the multiple donors. The findings of the court are equally applicable and necessary under an exculpatory evidence analysis. The trial court did not abuse its discretion in denying Mebane's motion for DNA testing at the State's expense.

Kansas has addressed funding for DNA testing only in the context of a pretrial request. In *Snodgrass*, the court applied K.S.A. 22-4508 to a pretrial request for State-funded DNA testing. K.S.A. 22-4508 provides that an indigent defendant may obtain investigative or expert services as necessary to an adequate defense by requesting them in an ex parte proceeding. " '[T]he granting or denial of a motion to provide funds for investigative services . . . is a matter which rests within the sound discretion of

the trial court.' " 252 Kan. at 265 (quoting *State v. Haislip*, 237 Kan. 461, 484, 701 P.2d 909, *cert. denied* 474 U.S. 1022 [1985]). The court found no abuse of discretion. The determination of when the State should pay for DNA testing should be left to the discretion of the trial court.

Affirmed.