STATE OF NEBRASKA, APPELLEE,
v. MOHAMED EL-TABECH, APPELLANT.
610 N.W. 2d 737

Filed May 19, 2000. No. S-99-558.

510

Robert B. Creager, of Anderson, Creager & Wittstruck, P.C., for appellant.

Don Stenberg, Attorney General, and Kimberly A. Klein for appellee.

HENDRY, C.J., WRIGHT, CONNOLLY, GERRARD, STEPHAN, McCORMACK, and MILLER-LERMAN, JJ.

CONNOLLY, J.

This appeal presents the question, What procedure, if any, may a prisoner, alleging actual innocence, use to request state-funded DNA testing when the time period has passed in which to file a motion for a new trial based on newly discovered evidence? The appellant, Mohamed El-Tabech, was convicted before the availability of deoxyribonucleic acid (DNA) fingerprinting. After such testing became available, he brought a motion seeking to compel DNA testing under the discovery statutes pertaining to criminal trials. This motion was denied. Following our decision in *State v. Freeman*, 253 Neb. 385, 571 N.W.2d 276 (1997), El-Tabech filed a motion under the Nebraska Postconviction Act, Neb. Rev. Stat. §§ 29-3001 to 29-3004 (Reissue 1995), seeking to compel testing. The district court dismissed the motion on the basis of procedural bar. We conclude that although El-Tabech's motion was not procedurally barred, the district court was correct in dismissing the motion because there is no statutory procedure by which El-Tabech may bring his claim, nor is there any statutory authorization for state funding of DNA tests.

## I. BACKGROUND

On June 24, 1984, in response to a 911 emergency dispatch service call, police and emergency personnel were dispatched to a home in Lincoln, Nebraska. Linda Woodruff, a paramedic employed by Eastern Ambulance Service, was the first to arrive at the scene. Upon entering the house, she observed El-Tabech seated on the floor, rocking back and forth and pointing to the back of the house.

El-Tabech's wife, Lynn El-Tabech, was found lying on a bed with a white terry cloth bathrobe belt tied tightly around her neck. Both the condition and temperature of her body indicated that she had not been dead for very long. Woodruff unsuccessfully attempted to untie the belt and then obtained scissors from the ambulance vehicle and cut the belt from around the decedent's neck. Shortly thereafter, other emergency personnel and the police arrived.

There was testimony from various witnesses regarding alleged remarks made by El-Tabech at that time. Woodruff recalled that she heard El-Tabech say, "Don't take me to jail" as he was being taken to a police car. A Lieutenant Soukup of the Lincoln Police Department heard El-Tabech say, "Who will take care of me now?" while he was on the porch of the residence. Sharon Hebbard, a neighbor who was 150 feet away from the El-Tabech porch, testified she heard El-Tabech say, "I didn't mean to" or "I didn't mean to do it." An Officer Sims of the Lincoln Police Department, who transported El-Tabech to the police station, heard him say, "Do you got whoever did that?" and "I swear I'll kill them."

Hebbard testified that she heard a 30-minute argument at the El-Tabech residence around 11 a.m. or noon on the day that the decedent was murdered. Hebbard remembered hearing a woman's voice say, "Leave me alone" and "Don't touch me." Hebbard's testimony was corroborated by her husband, who had also overheard the arguing.

David James, a member of the Mormon church that El-Tabech attended, testified that he spoke with El-Tabech at about 3 p.m. on the day of the murder. El-Tabech called the church, where James was in meetings. According to James, El-Tabech was quite upset and asked James if he would come right over and talk with El-Tabech and the decedent. When James told him that he could not make it until later, El-Tabech advised James that he and the decedent were having troubles. Specifically, James said he heard the decedent in the background say something to the effect, "I'm leaving. I'm going for a walk." El-Tabech then said, "Well, when will you be back?" and the decedent said, "I don't know." Then, El-Tabech said to James, "Well, she's leaving me."

A waitress at a Village Inn restaurant in Lincoln testified that she arrived at work at 4 p.m. on the day of the murder. She recalled that she waited on El-Tabech, who was dining with a woman, at about 5:30 p.m. She testified she heard the couple arguing when she took their food to their table. Specifically, she testified, "He said, 'You never tell me where you're going. I have a right to know where you are.'" She further testified that the statements were made in an angry, loud voice. According to the waitress, when she clocked out on break at 6:07 p.m., El-Tabech and the woman were still in the restaurant. When she returned from break at 6:41 p.m., they were gone.

The State also called Gertrude Makovicka, a neighbor of the El-Tabechs. At 6 p.m. on the day of the murder, she and her husband started watching a television program, "60 Minutes." She testified that they watched the show until its completion at 7 p.m. During part of that time, she was working in the kitchen. She could both see the television set and observe the El-Tabech residence from the kitchen. She testified that she saw the El-Tabechs arrive home at about 6:15 p.m. She further testified that shortly after 7 p.m., she went out on her porch. After she had been sitting outside for 5 to 10 minutes, she observed El-Tabech come out of his house. He got into his car and drove away. She remained on her porch and, approximately 10 minutes later, observed El-Tabech return with a small package. During the time that he was gone, Makovicka testified, she did not see anybody go into or come out of the El-Tabech residence. About 5 minutes after El-Tabech arrived back at his residence, Makovicka saw the first emergency vehicle arrive.

James' wife, Rhonda James, testified that she spoke to El-Tabech on the telephone just before 6:30 p.m. She took the telephone call at the church. She testified that El-Tabech "sounded upset, and he wanted to visit with [James]." El-Tabech asked that James come right by on his way home. She said she would relay the message to James but, in fact, did not tell him until after the family had gotten home from church. James attempted to call El-Tabech around 7 p.m., but no one answered the telephone.

The decedent's mother described El-Tabech as being very attentive for the affection of the decedent. She further testified

to an incident which had occurred on Memorial Day, when El-Tabech had been particularly upset that the decedent was not wearing her wedding ring. The decedent's mother also testified that on Father's Day preceding the day of the killing, the decedent and El-Tabech had announced that they were expecting a child.

The decedent's sister testified with regard to the announcement of the decedent's pregnancy. El-Tabech insisted that no one was to know about the pregnancy and was quoted as saying, "Who knows what may happen in the next few months." The decedent's sister also testified with regard to her observations concerning El-Tabech's demeanor and her concerns over his view of women generally. The decedent's sister testified that El-Tabech was against the decedent's wearing makeup and that he tended to have aggressive behavior toward the decedent. She also testified that over the course of the 6 months of the marriage, the decedent had, on a number of occasions, indicated that she did not favor the attention that was being bestowed upon her and, in fact, had specifically informed El-Tabech to "[l]eave me alone." The decedent's sister further testified that it was her observation that the decedent had become more and more concerned with the attention from El-Tabech and that she had in some ways "withdrawn." This testimony was corroborated by the decedent's sister's husband.

El-Tabech's defense was that between 7 and 7:30 p.m., he was out of the home purchasing ice cream and therefore could not have committed the murder. Evidence at trial included a grocery store receipt showing a purchase of ice cream bars at 7:23 p.m. In addition, El-Tabech called Khalil Chehab as a witness for the defense. Chehab testified that on June 24, 1984, he made an overseas call to his mother at about 5 p.m. California time, or 7 p.m. local time. During this telephone call, he received a message for El-Tabech. When Chehab got off the telephone, he tried to call his wife, but received no answer. According to Chehab, this was a little after 5 p.m. California time. He then decided to call El-Tabech and give him the overseas message. He claimed that he called the El-Tabech number and that a woman who identified herself as the decedent answered. He asked for El-Tabech, but was unable to speak with him. He then testified that

he left a message for El-Tabech with the woman who had answered the telephone. On cross-examination, Chehab admitted that he was not wearing a wristwatch on the day in question and that he was estimating the times.

During trial, Dr. Reena Roy testified regarding tests that had been performed on physical evidence found at the crime scene. Roy examined bloodstains on the robe worn by the decedent and stated that they were consistent with coming from the decedent and inconsistent with coming from El-Tabech. Blood found on a pillowcase was also consistent with the decedent, but inconsistent with El-Tabech. Roy testified that the panties worn by the decedent tested negative for semen, but there was a small dot of blood, almost like a pinpoint, that she was unable to group because there was not enough. Oral, vaginal, and rectal swabs taken from the decedent also tested negative for the presence of semen. Roy testified that there was a tuft of hair in the knot of the decedent's robe belt. Roy further testified that seven of the hairs were characteristic of the decedent's hair and that she found one hair that was not consistent. This hair had qualities that were consistent with El-Tabech, but also had qualities that were dissimilar from him. Other samples of hair collected from various places yielded the same results. The record indicates that DNA fingerprinting was not utilized when testing the evidence.

El-Tabech was convicted of first degree murder and use of a weapon to commit a felony. His convictions and sentences were affirmed on direct appeal in 1987. *State v. El-Tabech*, 225 Neb. 395, 405 N.W.2d 585 (1987). In 1988, El-Tabech filed a post-conviction action alleging ineffective assistance of counsel. Following an evidentiary hearing, the trial court dismissed the action, and we affirmed on appeal. *State v. El-Tabech*, 234 Neb. 831, 453 N.W.2d 91 (1990).

On May 30, 1996, El-Tabech filed a pro se "Verified Due Process Motion to Conduct 'DNA' Fingerprinting and Analysis by Defendant." El-Tabech brought the motion pursuant to Neb. Rev. Stat. §§ 29-1913 to 29-1916 (Reissue 1995), which are statutory sections pertaining to a criminal defendant's discovery and testing of evidence of the prosecuting attorney. In the motion, El-Tabech alleged that prior to and during his trial,

DNA fingerprinting and analysis was not available as a method of identification but had become available in recent years. He further alleged that his trial record reflects that evidence consisting of blood, semen, hair, stains, and other substances acquired at the crime scene were tested by Roy, who was an "apprentice" at the time, and that the tests were inconclusive. El-Tabech then alleged that he was convicted on entirely circumstantial evidence, that he has continually maintained his innocence, and that DNA testing of the evidence at the crime scene could prove his innocence. Based on this, El-Tabech alleged that his constitutional right to due process would be denied if he were unable to have DNA fingerprint testing conducted on the evidence. The district court denied the motion without opinion on the same day that it was filed. El-Tabech did not appeal from the denial of the motion.

In December 1997, El-Tabech filed the instant postconviction proceeding. In his motion to vacate and set aside his convictions and sentences, El-Tabech alleged that our decision in *State v. Freeman*, 253 Neb. 385, 571 N.W.2d 276 (1997), legitimized the use of DNA fingerprinting and, thus, provided grounds for postconviction relief that did not exist at the time he filed his first postconviction motion. In his motion, El-Tabech stated that the district court had previously denied his first discovery motion to have DNA fingerprinting conducted prior to this court's decision in *State v. Freeman, supra*. El-Tabech then made essentially the same allegations and requested testing as in his first verified motion. In addition, El-Tabech alleged that he received ineffective assistance of counsel at trial because his trial counsel failed to (1) hire an expert with more experience than Roy because the evidence was not properly utilized, even under the technology available at the time, and (2) explain to him the consequences if he were to accept a plea bargain. El-Tabech then requested an evidentiary hearing on the matter and requested that the evidence obtained for trial be turned over for DNA fingerprinting at the State's expense. The State filed a motion to deny the requested evidentiary hearing.

On August 6, 1998, the district court determined that any consideration of the ineffective assistance of counsel claim was procedurally barred because El-Tabech had already litigated the

issue of ineffective assistance of counsel in his first postconviction action. However, the district court determined that the issue of DNA testing merited the appointment of counsel. Accordingly, the district court appointed counsel and allowed 20 days for the filing of an amended petition.

El-Tabech filed an amended postconviction motion in which he repeated the same allegations regarding the evidence found at the crime scene. El-Tabech also alleged that scientific analysis would "conclusively demonstrate that the person who provided or contributed the physical evidence . . . was someone other than [El-Tabech] and therefore conclusively establish [his] innocence of the crime charged." El-Tabech also brought separate motions seeking to compel production of the physical evidence and for funds to pay for DNA testing of the evidence.

The district court dismissed the action on the basis that El-Tabech's previous motion made under the discovery statutes had been overruled. El-Tabech appeals.

## II. ASSIGNMENTS OF ERROR

El-Tabech assigns that the district court erred in determining that his claim was procedurally barred and that it abused its discretion in failing to grant a hearing on the discovery motions. He does not appeal the dismissal of his ineffective assistance of counsel claims.

## III. STANDARD OF REVIEW

■ A defendant requesting postconviction relief must establish the basis for such relief, and the findings of the district court will not be disturbed unless they are clearly erroneous. *State v. Lyle*, 258 Neb. 263, 603 N.W.2d 24 (1999); *State v. Palmer*, 257 Neb. 702, 600 N.W.2d 756 (1999).

■ In a motion for postconviction relief, the defendant must allege facts which, if proved, constitute a denial or violation of his or her rights under the U.S. or Nebraska Constitution, causing the judgment against the defendant to be void or voidable. *State v. Cook*, 257 Neb. 693, 601 N.W.2d 501 (1999).

■ A defendant is entitled to bring a second proceeding for postconviction relief only if the grounds relied upon did not exist at the time the first motion was filed. *State v. Ryan*, 257 Neb. 635, 601 N.W.2d 473 (1999).

## IV. ANALYSIS

### 1. PROCEDURAL BAR

■ El-Tabech contends that his claim is not procedurally barred because it was not available for review in previous proceedings. A motion for postconviction relief cannot be used to secure review of issues which were or could have been litigated on direct appeal, no matter how those issues may be phrased or rephrased. *State v. Lyman*, 241 Neb. 911, 492 N.W.2d 16 (1992).

This court first discussed the use of DNA fingerprinting in 1992 in *State v. Houser*, 241 Neb. 525, 490 N.W.2d 168 (1992). In *Houser*, we recognized that such evidence was generally accepted in the relevant scientific community. However, we also required that a set of conditions be satisfied before such evidence would be admissible based on concerns that the prejudicial effect of such evidence could be outweighed by its probative value. In *State v. Carter*, 246 Neb. 953, 524 N.W.2d 763 (1994), we determined that the calculation of statistical probability used in conjunction with such testing had not gained general acceptance in the scientific community. It was not until *State v. Freeman*, 253 Neb. 385, 571 N.W.2d 276 (1997), that we upheld the admission into evidence of DNA fingerprinting. In *Freeman*, we overruled *Carter* to the extent that it was based on an outdated level of acceptance of such evidence in the relevant scientific community.

Based on the progression of case law concerning the acceptance of DNA fingerprint analysis, it is clear that El-Tabech did not have a basis upon which to request such testing when he filed his first postconviction action in 1988. However, the issue remains whether he is procedurally barred due to the fact that the district court denied his first motion made under the discovery statutes, §§ 29-1913 to 29-1916, in 1996. El-Tabech did not appeal from the denial of that motion.

■ It has been held that there must be a proceeding pending in order to bring a discovery request because, generally speaking, discovery relates to specific proceedings. See *Hunt v. State*, 480 So. 2d 61 (Ala. Crim. App. 1985) (discovery prior to filing petition for writ of error coram nobis was premature). In addition, we have held that orders requiring or denying discov-

ery generally do not constitute a final disposition of the proceedings and, therefore, are not normally appealable. *Brozovsky v. Norquest*, 231 Neb. 731, 437 N.W.2d 798 (1989).

In the instant case, §§ 29-1913 to 29-1916 are statutes pertaining to a defendant's ability to discover prosecutorial evidence preliminary to trial. They are not sections giving rise to independent proceedings. Thus, the order denying El-Tabech's request under these sections did not act to dismiss any proceeding filed by him. Rather, there was no current proceeding, and the denial of the discovery motion was not a final, appealable order. Under such circumstances, there is no procedural bar. Accordingly, we address whether El-Tabech can compel state-funded DNA testing in a proceeding under the Nebraska Postconviction Act or any other proceeding.

## 2. Lack of Procedure to Compel State-Funded DNA Testing Postconviction

The difficulty in this case is that the Nebraska statutes do not provide a specific procedure whereby a person, convicted prior to the availability of DNA testing, may later bring a motion to compel such testing based on the contention that DNA tests of physical evidence could prove actual innocence. Furthermore, even if a common-law action is available to bring such a request, there is no statutory procedure under which the State can be compelled to pay for such testing when the request is brought by a prisoner who is indigent.

### (a) New Trial

Because of the length of time between his conviction and the availability of DNA testing, El-Tabech cannot bring a motion for a new trial. Neb. Rev. Stat. § 29-2101 (Reissue 1995) provides:

A new trial, after a verdict of conviction, may be granted, on the application of the defendant, for any of the following reasons affecting materially his substantial rights: (1) Irregularity in the proceedings of the court, or the prosecuting attorney, or the witnesses for the state, or any order of the court, or abuse of discretion, by which the defendant was prevented from having a fair trial; (2) mis-

conduct of the jury or the prosecuting attorney, or of the witnesses for the state; (3) accident or surprise which ordinary prudence could not have guarded against; (4) that the verdict is not sustained by sufficient evidence or is contrary to law; *(5) newly discovered evidence material for the defendant which he could not with reasonable diligence have discovered and produced at the trial*; or (6) error of law occurring at the trial.

(Emphasis supplied.) However, pursuant to § 29-2101, a motion for a new trial based on newly discovered evidence must be brought within 3 years of the date of the verdict. Neb. Rev. Stat. § 29-2103 (Reissue 1995) provides in part:

In any criminal case where it shall be made to appear upon the motion of the defendant for a new trial, supported by affidavits, depositions or oral testimony, that the defendant has discovered new evidence material to his defense which he could not with reasonable diligence have discovered and produced during the term within which the verdict upon which he was sentenced was rendered, the district court may set aside such sentence and grant a new trial; Provided, that such motion is filed within a reasonable time after the discovery of the evidence; and provided further, that such motion must be filed within three years after the date of such verdict, *and such motion and the procedure herein provided shall be the exclusive method and procedure for reviewing criminal cases after the expiration of the term at which such verdict is rendered.*

(Emphasis supplied.) (Emphasis omitted.) This language indicates a legislative intent that newly discovered evidence may not be considered under any theory after 3 years from the date of the verdict. In addition, we have stated that the statute providing for a motion for new trial does not afford a remedy to a person wrongfully convicted unless a motion for new trial is filed within the statutory limits. *Carlsen v. State*, 129 Neb. 84, 261 N.W. 339 (1935).

#### (b) Postconviction and Habeas Corpus

Unable to bring a motion for a new trial, El-Tabech brought this action pursuant to the Nebraska Postconviction Act alleging

that he is innocent and as such, has a right to be free from wrongful incarceration under the 14th Amendment to the U.S. Constitution and article I, § 3, of the Nebraska Constitution. He further alleged in his operative petition that in the absence of a statutory procedure under which he could use the results of DNA testing to set aside his convictions and sentences, state-funded testing should still be compelled because he could use the results to seek a pardon. Finally, El-Tabech alleged that he has a property right in the ability to pursue relief from a wrongful conviction or sentence.

The essential problem concerning El-Tabech's motion made under the Nebraska Postconviction Act is the requirement that there be a constitutional violation. Although El-Tabech couched the issue in terms of a due process violation, his motion is akin to a motion for a new trial based on newly discovered evidence. Yet, El-Tabech could not bring a motion for a new trial based on newly discovered evidence within the 3-year time limit because DNA fingerprinting was not available at that time.

 Section 29-3001 pertains to postconviction actions and provides in part:

> A prisoner in custody under sentence and claiming a right to be released on the ground that there was such a denial or infringement of the rights of the prisoner as to render the judgment void or voidable under the Constitution of this state or the Constitution of the United States, may file a verified motion at any time in the court which imposed such sentence, stating the grounds relied upon, and asking the court to vacate or set aside the sentence.

Thus, relief under the Nebraska Postconviction Act is limited to denial or infringement of a prisoner's rights under the federal or state Constitution so as to render the judgment void or voidable. *State v. Thomas*, 236 Neb. 553, 462 N.W.2d 862 (1990). A motion for postconviction relief is not a substitute for an appeal. *State v. Carpenter*, 186 Neb. 605, 185 N.W.2d 663 (1971).

The U.S. Supreme Court held in *Herrera v. Collins*, 506 U.S. 390, 113 S. Ct. 853, 122 L. Ed. 2d 203 (1993), that it is constitutional for a state to require that a motion for new trial based on newly discovered evidence be brought within 30 days, even

when there is no other statutory remedy available for bringing a claim of actual innocence. In so holding, the Court stated that the petitioner was not without a remedy because he could request executive clemency under state law.

The Court in *Herrera* further held that under federal habeas principles, the existence merely of newly discovered evidence relevant to the guilt of a prisoner is not a ground for relief. "This rule is grounded in the principle that federal habeas courts sit to ensure that individuals are not imprisoned in violation of the Constitution—not to correct errors of fact." 506 U.S. at 400. The federal courts do allow an exception for prisoners who have made constitutional claims that would normally be procedurally barred when those prisoners sufficiently show a claim of actual innocence. This rule, known as the fundamental miscarriage of justice exception, is grounded in the " 'equitable discretion' " of habeas courts to see that federal constitutional errors do not result in the incarceration of innocent people. 506 U.S. at 404. Thus, the Court stated that "this body of our habeas jurisprudence makes clear that a claim of 'actual innocence' is not itself a constitutional claim, but instead a gateway through which a habeas petitioner must pass to have his otherwise barred constitutional claim considered on the merits." *Id.* See, also, *Schlup v. Delo*, 513 U.S. 298, 115 S. Ct. 851, 130 L. Ed. 2d 808 (1995) (distinguishing case from facts in *Herrera* based on existence of underlying constitutional claim).

Concurring in *Herrera*, Justices Scalia and Thomas emphasized that "there is no basis in text, tradition, or even in contemporary practice . . . for finding in the Constitution a right to demean judicial consideration of newly discovered evidence of innocence brought forward after conviction." 506 U.S. at 427-28 (Scalia, J., concurring; Thomas, J., joins). See, also, *Spencer v. Murray*, 5 F.3d 758 (4th Cir. 1993) (actual innocence is not itself constitutional claim and assertion of potential errors in DNA tests is claim of factual innocence, rather than claim of errors at law). In addition, another jurisdiction has stated that discovery is not required under the Due Process Clause of the U.S. Constitution. *Sewell v. State*, 592 N.E.2d 705 (Ind. App. 1992). More specifically, it has been also held that there is no constitutional right to DNA testing. *State v. Frazier*, Nos. IN

88-09-0214R1 to IN 88-09-0221R1, 1995 WL 654433 (Del. Super. Aug. 3, 1995).

Jurisdictions that have allowed DNA testing or evidence as part of postconviction proceedings either have broader statutory provisions than those in Nebraska, have found a constitutional right under their state constitution, or were decided prior to the U.S. Supreme Court's decision in *Herrera*. See, e.g., *People v. Washington*, 171 Ill. 2d 475, 665 N.E.2d 1330, 216 Ill. Dec. 773 (1996) (based on state constitution); *Summerville v. Warden*, 229 Conn. 397, 415, 641 A.2d 1356, 1365 (1994) (citing Conn. Gen. Stat. § 52-471(a), habeas statute providing that court must " 'dispose of the case as law and justice require' "); *Mebane v. State*, 21 Kan. App. 2d 533, 902 P.2d 494 (1995) (citing Kan. Stat. Ann. § 60-1507 which is broader postconviction act; *Sewell v. State, supra* (decided prior to *Herrera v. Collins*, 506 U.S. 390, 113 S. Ct. 853, 122 L. Ed. 2d 203 (1993)); *People v. Callace*, 151 Misc. 2d 464, 573 N.Y.S.2d 137 (1991) (decided prior to *Herrera*); *Dabbs v. Vergari*, 149 Misc. 2d 844, 570 N.Y.S.2d 765 (1990) (decided prior to *Herrera*). Compare *Jenner v. Dooley*, 590 N.W.2d 463, 471 (S.D. 1999) (stating courts should consider reopening case if "a 'truly persuasive' showing of actual innocence lies close at hand").

We determine that El-Tabech cannot bring his request under the Nebraska Postconviction Act, nor is there an alternate statutory procedure, such as habeas, under which his request can be brought. See, *Hawk v. Olson*, 145 Neb. 306, 16 N.W.2d 181 (1944) (habeas is not proper remedy to release one from prison who has been wrongfully convicted), *reversed on other grounds* 326 U.S. 271, 66 S. Ct. 116, 90 L. Ed. 61 (1945); *Carlsen v. State*, 129 Neb. 84, 261 N.W. 339 (1935). See, also, *Rehbein v. Clarke*, 257 Neb. 406, 598 N.W.2d 39 (1999) (habeas corpus in this state is quite limited in comparison to those of federal courts, which allow writ of habeas corpus to prisoner when in custody in violation of federal Constitution). We next consider whether there exists a common-law action under which El-Tabech's request may be brought.

### (c) Coram Nobis

Although El-Tabech brought his discovery request as part of a petition under the Nebraska Postconviction Act, his

petition could be interpreted to be a request for a writ of error coram nobis. The common-law writ of error coram nobis exists in this state under Neb. Rev. Stat. § 49-101 (Reissue 1998). See, *Parker v. State*, 178 Neb. 1, 131 N.W.2d 678 (1964); *Carlsen v. State, supra*. The purpose of the writ of error coram nobis is to bring before the court rendering the judgment matters of fact which, if known at the time the judgment was rendered, would have prevented its rendition. *Parker v. State, supra*. It enables the court to recall some adjudication that was made while some fact existed which would have prevented rendition of the judgment but which, through no fault of the party, was not presented. *Id*. The writ of error coram nobis is not available to correct errors of law. *State v. Turner*, 194 Neb. 252, 231 N.W.2d 345 (1975). The burden of proof in a proceeding to obtain a writ of error coram nobis is upon the plaintiff, and the alleged error of fact must be such as would have prevented a conviction. It is not enough to show that it might have caused a different result. *Parker v. State, supra*.

The use of coram nobis is limited because not only are all errors of law excluded, but also because all errors of fact which were, could have been, or should have been reviewed using any statutory remedy are likewise excluded. Thus, the ability to seek a writ of error coram nobis is one of timing.

> If a party obtains newly discovered material evidence, the new trial motion statutes for both civil and criminal actions furnish a means whereby it can be brought to the court's attention. A party who possesses such evidence, but who fails to bring it forward during the statutory period within which a new trial motion can be made, is not permitted to use coram nobis as a substitute for his or her earlier inaction. Use it or lose it. This is how the policy of statutory exclusion works.

Morgan Prickett, *The Writ of Error Coram Nobis in California*, 30 Santa Clara L. Rev. 1, 17 (1990). See, also, *Barker v. State*, 244 Ind. 267, 191 N.E.2d 9 (1963) (when motion brought after time has expired under statute providing for motion for new trial, writ of error coram nobis may be sought if facts in support of it were not known to defendant within time that motion for new trial could be brought).

We have specifically analyzed the use of coram nobis as a procedure to address a claim of wrongful conviction when no corrective judicial process has been prescribed by statute. *Carlsen v. State*, 129 Neb. 84, 261 N.W. 339 (1935). In particular, we recognized that the writ of error coram nobis has been effectually resorted to in criminal cases where no other form of judicial relief existed. *Id.* Further, we have previously considered a case in which the petitioner was claiming actual innocence and was seeking a writ of error coram nobis approximately 9 years after he was convicted. *Parker v. State, supra.*

However, in the instant case, coram nobis could possibly be an applicable remedy only if El-Tabech already had the results of DNA testing and wished to present those results to the district court. Instead, El-Tabech wishes to compel the State to pay for the requested testing. There is no procedure under the discovery statutes that an individual may use to compel an opposing party to pay for discovery requests in such an action. Thus, even if a coram nobis action might be available as a means of presenting DNA evidence showing innocence, it does not provide a means of compelling state-funded discovery of that evidence.

The upshot of the preceding discussion is that this case presents a situation analogous to an attempt to fit a square peg into a round hole. There is simply no existing procedure under which El-Tabech may sufficiently fit his request. The time period has passed during which a motion for new trial may be filed, there is no constitutional error allowing relief under the Nebraska Postconviction Act, habeas is not available, and there is no method under which to compel state-funded testing in a common-law civil action, such as a request for a writ of error coram nobis.

One could argue that it might be possible under more extraordinary circumstances to find a constitutional issue allowing a remedy under the Nebraska Postconviction Act. For example, the Court in *Herrera* assumed, for the sake of argument, that "in a capital case a truly persuasive demonstration of 'actual innocence' made after trial would render the execution of a defendant unconstitutional." *Herrera v. Collins*, 506 U.S. 390, 417, 113 S. Ct. 853, 122 L. Ed. 2d 203 (1993). However, under the fac-

tual circumstances of this case, where no constitutional issue presents itself, we decline at this time to attempt to fashion a procedure where none exists. Such action is the province of the Legislature. The question of how an allegation of actual innocence combined with a request for state-funded DNA testing should be raised involves competing policy interests. On one hand is a respect for finality of judgments and the social costs of a possible retrial, while on the other is the equitable desire to see that justice is honestly served. As one author has noted:

"[I]n a democratic society legislatures, not courts, are constituted to respond to the will and consequently the moral values of the people." . . .

The balancing of such social, moral, and policy factors is the responsibility of the legislature. Legislative bodies are better equipped to determine, by fleshing out through legislative deliberation, who should bear the possible risks of error and how those risks should be allocated. Indeed, state legislatures have the power and resources to develop effective procedures for vindicating actually innocent defendants, and should be urged to do so. . . .

. . . .

[A]t the very least, state legislatures should provide remedies for entertaining petitions based on material scientific evidence, by prisoners asserting actual innocence, without regard to generally applicable time limitations.

Arleen Anderson, *Responding to the Challenge of Actual Innocence Claims After* Herrera v. Collins, 71 Temp. L. Rev. 488, 516-17 (1998). See, also, 725 Ill. Comp. Stat. Ann. 5/116-3 (Lexis 2000) (providing statutory remedy following Illinois case People v. *Washington*, 171 Ill. 2d 475, 665 N.E.2d 1330, 216 Ill. Dec. 773 (1996)); N.Y. Crim. Proc. Law § 440.30 (McKinney 1994) & West Cum. Supp. 2000 (providing statutory remedy following consideration of issue in courts).

## V. CONCLUSION

We conclude that there is not a procedural bar in the instant case. However, we determine that in the absence of a legislatively mandated procedure, there is no recourse currently available under which a prisoner alleging actual innocence is

able to bring a claim after the time period has run to bring a motion for new trial. Furthermore, we conclude that there is no statutory authorization for a prisoner to have state-funded DNA testing conducted. Accordingly, the order of the district court is affirmed.

AFFIRMED.

GERRARD, J., concurring.

Because deoxyribonucleic acid (DNA) testing would not conclusively prove that Mohamed El-Tabech is innocent of the murder of Lynn El-Tabech, I concur in the result of the instant case. Unlike the majority, however, I am of the opinion that in a rare and appropriate case, a claim of "actual innocence" may be presented by way of a motion seeking postconviction relief under Neb. Rev. Stat. §§ 29-3001 through 29-3004 (Reissue 1995).

Section 29-3001 provides:

> A prisoner in custody under sentence and claiming a right to be released on the ground that there was such a denial or infringement of the rights of the prisoner as to render the judgment void or voidable under the Constitution of this state or the Constitution of the United States, may file a verified motion at any time in the court which imposed such sentence, stating the grounds relied upon, and asking the court to vacate or set aside the sentence.
>
> . . . If the court finds that there was such a denial or infringement of the rights of the prisoner as to render the judgment void or voidable under the Constitution of this state or the Constitution of the United States, the court shall vacate and set aside the judgment and shall discharge the prisoner or resentence him or grant a new trial as may appear appropriate.

As with any other claim made as part of a motion for postconviction relief, however, a defendant asserting an "actual innocence" claim bears the burden of showing that she or he is entitled to relief. Before an "actual innocence" claim may properly result in postconviction relief, it must be determined which, if any, of a prisoner's constitutional rights have been denied so as to render the judgment void or voidable.

The U.S. Supreme Court has noted that "the injustice that results from the conviction of an innocent person has long been

at the core of our criminal justice system." *Schlup v. Delo*, 513 U.S. 298, 325, 115 S. Ct. 851, 130 L. Ed. 2d 808 (1995). Prior to *Schlup*, Justice Blackmun, joined by Justices Stevens and Souter, explained that it "may violate the Eighth Amendment to imprison someone who is actually innocent," but declined to address the question because the Court "[was] not asked to decide . . . whether petitioner's continued imprisonment would violate the Constitution if he actually is innocent." *Herrera v. Collins*, 506 U.S. 390, 432 n.2, 113 S. Ct. 853, 122 L. Ed. 2d 203 (1993) (Blackmun, J., dissenting). Justice Blackmun noted the distinct possibility that the continued incarceration of an innocent person violates the Eighth Amendment and has suggested that for that reason, such a person must have recourse to the judicial system. *Id.* I am also of the opinion that the continued imprisonment of someone who is actually innocent may well violate the Eighth Amendment and that due process mandates that such a person have recourse to the judicial system. The right to fundamental fairness does not end at the conclusion of a criminal trial.

The continued imprisonment of an actually innocent person would violate the fundamental principles upon which our criminal justice system is based. To avoid such a grievous outcome, courts should solemnly consider reopening a case if a "truly persuasive" showing of actual innocence lies close at hand. See *Herrera v. Collins*, 506 U.S. at 417. Accord *Jenner v. Dooley*, 590 N.W.2d 463 (S.D. 1999).

The Due Process Clause of both the federal and the state Constitutions requires more than a defendant's being convicted as a result of a trial free of constitutional error, as the very absence of a procedure through which "actual innocence" claims can be addressed implicates an individual's constitutional right to due process. See, e.g., *People v. Washington*, 171 Ill. 2d 475, 665 N.E.2d 1330, 216 Ill. Dec. 773 (1996) (holding that actual innocence claims are cognizable under due process provision in state constitution); *Sewell v. State*, 592 N.E.2d 705 (Ind. App. 1992) (noting that fundamental fairness may require postconviction DNA testing in appropriate case); *Com. v. Brison*, 421 Pa. Super. 442, 453, 618 A.2d 420, 425 (1992) (relying on "principles of justice" to vacate conviction and order

postconviction DNA testing). In the rare case of actual innocence, it is the state's continued incarceration of such an innocent person, without affording an opportunity to present newly discovered compelling evidence, that constitutes "such a denial or infringement of the rights of the prisoner as to render the judgment void or voidable under the Constitution of this state or the Constitution of the United States." § 29-3001.

Even with that established, I want to be clear that not every convict who cries innocence should be able to reopen a case to analyze old evidence based on the newest scientific techniques. Our system of justice would be given little respect if its judgments were never final. Only in extraordinary circumstances should a court allow postconviction scientific testing.

Several courts have formulated guidelines for when postconviction scientific analysis may be authorized, and after careful consideration, I would postulate the following conditions for Nebraska courts: First, a showing must be made that if the matter were presently tried, the defendant would be entitled to the testing and the results would be admissible, i.e., scientifically reliable. Second, because convicted defendants may not obtain reconsideration of their cases whenever some new technology promises to reveal another angle on the evidence against them, it must be shown that a favorable result using the latest scientific procedures would most likely produce an acquittal in a new trial. *Jenner v. Dooley, supra* (citing *Dumond v. Lockhart*, 911 F.2d 104 (8th Cir. 1990)). With biological evidence, courts have generally found postconviction testing most suitable when (1) identity of a single perpetrator is at issue; (2) evidence against the defendant is so weak as to suggest real doubt of guilt; (3) the scientific evidence, if any, used to obtain the conviction has been impugned; and (4) the nature of the biological evidence makes testing results on the issue of identity virtually dispositive. *Jenner v. Dooley, supra.*

With the foregoing in mind, and applying these guidelines, I conclude that postconviction scientific analysis is unsuitable in the instant case. I discern no likelihood that a favorable DNA test result of the physical evidence obtained at the scene of the crime would produce an acquittal were El-Tabech granted a new trial. The evidence against him at the original trial was quite per-

suasive. Even proof that someone else's DNA might appear on some unspecified physical item at the crime scene does not exclude El-Tabech as the perpetrator of the crime. At most, DNA testing in the present case would create only another circumstance on which El-Tabech could argue reasonable doubt. Simply put, scientific testing would not prove conclusive on the question of innocence, especially in light of all the other evidence against El-Tabech. The evidence in the original trial did not suggest any real doubt of the guilt of El-Tabech. See *State v. El-Tabech*, 225 Neb. 395, 405 N.W.2d 585 (1987).

In sum, postconviction DNA testing is not appropriate in the instant case because it cannot be shown that any type of favorable result using the latest DNA testing procedures would most likely produce an acquittal of El-Tabech in a new trial. Therefore, based on the above reasoning, I would affirm the order of the district court denying El-Tabech's request for DNA testing and postconviction relief.