William G. OSBORNE, Appellant,

v.

STATE of Alaska, Appellee.

No. A–8399.

Court of Appeals of Alaska.

April 15, 2005.

**11.** 859 P.2d 263, 267 (Colo.App.1993).

**12.** 270 Ga. 671, 512 S.E.2d 614, 617 (1999).

**13.** *Id.*

**14.** 637 A.2d 1162, 1167 (Me.1994).

Randall S. Cavanaugh, Kalamarides & Lambert, Anchorage, for Appellant.

Nancy R. Simel, Assistant Attorney General, Office of Special Prosecutions and Appeals, Anchorage, and Gregg D. Renkes, Attorney General, Juneau, for Appellee.

Before: COATS, Chief Judge, and MANNHEIMER and STEWART, Judges.

### *OPINION*

COATS, Chief Judge.

A jury convicted William G. Osborne of kidnapping, first-degree assault, and two counts of first-degree sexual assault.[1] Osborne appealed his convictions, and this court affirmed.[2] Osborne then filed an application for post-conviction relief on the ground that his trial counsel provided him ineffective assistance because she decided not to seek more advanced DNA testing on some of the physical evidence that connected Osborne to the crime. Superior Court Judge Sharon Gleason denied Osborne's application on the ground that he failed to establish a prima facie case that he received ineffective assistance from his attorney. Osborne appeals. We affirm Judge Gleason's decision that Osborne did not establish a prima facie case of ineffective assistance. Osborne also argues that he has a due process right to further

1. *Osborne v. State*, Alaska App. Memorandum Opinion and Judgment No. 5329 at 6 (Feb. 7, 1996).

2. *Id.* at 19.

DNA testing of the evidence. We remand to allow Judge Gleason to reconsider her decision whether to allow Osborne the opportunity to have further DNA tests performed.

*Factual and procedural background*

The underlying factual and procedural history of Osborne's case was previously explained in *Osborne v. State.*[3]

On March 22, 1993, Dexter C. Jackson and Osborne invited K.G. into Jackson's car with the promise that they would pay her $100 for oral sex. Jackson and Osborne took K.G. to a secluded spot at the west end of Northern Lights Boulevard, ignoring her request that they park along Spenard Road. During the ride along Northern Lights Boulevard, Jackson and Osborne asked K.G. if she was armed, and when she told them that she had a Swiss army knife, they asked if they could look at the knife. They took the knife and placed it on the car's dashboard when she surrendered it.

When the three stopped at the end of the street, the men asked K.G. to perform fellatio on each of them with the understanding that she would be paid afterward. When K.G. told Osborne and Jackson that she would not perform without first being paid, Osborne pointed a gun at her and told her, "I think you will."

Jackson and Osborne took what little money K.G. had, made K.G. strip, and then had sex with her. K.G. performed oral sex on Jackson while Osborne penetrated K.G. vaginally with his finger and his penis. Afterward, Osborne ordered K.G. to "get out of the car, bitch, and lay down in the snow, face down."

When K.G. stayed in the car and began pleading for her life, Jackson hit K.G. in the head with the gun and Osborne choked her after being urged to do so by Jackson. In her extreme fear, K.G. defecated on the front passenger seat of Jackson's car. Osborne scooped up some of the excrement and rubbed it in K.G.'s face, hair, and clothing. When she was able to do so, K.G. grabbed some of her clothes and fled a short distance from the car where she began to dress.

The two men took a piece of wood, probably an ax handle, from the back of the car and began to strike K.G. in the back of her head and in her ribs. When K.G. tried to run, Osborne battered her knees repeatedly, telling her, "go down, bitch, go down." Jackson and Osborne hit and kicked K.G. until she fell down. Jackson continued to pound K.G. in the area of her pubic bone with the stick even after she had fallen. At one point, Osborne allowed K.G. to stand up, but then hit her in the head with the ax handle.

K.G. decided to pretend that she was dead, and curled into a fetal position in the snow. At trial, K.G. recounted how she had heard the gun discharge and felt the bullet graze her head. K.G. believed, based on glimpses of her assailants' feet and of Osborne's sweatsuit, that it was Osborne who had shot her. The State produced expert testimony at trial showing that one of K.G.'s head injuries was a "shallow gouge" injury consistent with a close scrape with a bullet. Jackson and Osborne then buried K.G. in the snow, believing that she was either dead or dying.

K.G. heard Jackson's car drive away. She continued to lie under the snow for some time to make sure that her attackers had left the area, then got up. After walking toward town for a short while, K.G. was able to flag down a passing automobile. K.G. told the car's driver and passenger what had happened to her; she also described the men who had attacked her and the car that they had driven. K.G. asked to be taken home because she wished to avoid the police. The driver and passenger of the car complied with her request.

The next day, the incident was reported to the police by a neighbor of one of the occupants of the car that had taken K.G. home. When she was contacted by the police, K.G. was initially uncooperative, but was persuaded to describe what had happened to her and to turn over the clothes that she had been wearing. The clothes were soiled with feces. A presumptive test indicated that semen was present on one piece of clothing, but no semen was recovered. K.G. also underwent

**3.** *Id.* at 1–6.

a physical examination and most of her injuries were photographed.

On March 28, 1993, at about 12:30 a.m., military police stopped Jackson's car on Fort Richardson. The military police were aware that the Anchorage Police Department had circulated composite drawings of a car and two black males, and further noted that Jackson, his passenger (who was not Osborne), and the car resembled the drawings. The police testified at trial that they had initially stopped Jackson because he had been flashing his headlights at a pickup driving in front of him. When Jackson opened his glove compartment in order to retrieve the title to his car, an officer saw a gun case. The case contained Jackson's .380 caliber automatic pistol.

When the military police searched the car, they found a box of ammunition for the gun under the passenger seat. During a search of Jackson, the military police found K.G.'s Swiss army knife in his pocket. (The knife was uniquely marked and dented and K.G. was able to readily identify it.) The officers arrested Jackson and the passenger and took them to the military police station.

The military police turned over the car and items seized to the Anchorage Police Department. Anchorage police officers found additional ammunition in a subsequent search of the car. The municipal police also detected blood in the car. Subsequent DNA testing of this blood, using a PCR (polymerase chain reaction) analysis of the DQ-alpha locus (a particular region of the DNA molecule), showed that the genetic makeup of the blood matched K.G.'s genetic makeup—a match that could be expected in 4.4 to 4.8% of white females. Fibers matching the carpeting were found on one of the sweaters K.G. had been wearing that night.

K.G. later identified both Jackson and Osborne in photographic lineups. She also identified Jackson's car.

An investigation of the scene of the assault, conducted on the evening of March 23, revealed an area of disturbed and bloody snow. The police also discovered two pairs of K.G.'s bloody gray stretch pants, a used blue condom, and an expended round of .380 ammunition that was later determined to have come from Jackson's gun. Tire tracks on the scene matched those made by Jackson's car.

A pubic hair taken from the blue condom and another found on the sweater K.G. had worn on the night of the assault had the same characteristics as Osborne's pubic hair. Another Negroid hair found on K.G.'s sweater did not match any of the suspects investigated by police. Sperm in the condom matched Osborne's DNA (based on PCR testing of his DQ-alpha locus). Osborne's DNA type is shared by between 14.7% and 16% of the African–American population.

An ax handle was later found 114 feet from the crime scene. Osborne used similar ax handles in his work and one was found during a search of his room. Jackson was also known to keep a similar kind of stick in the back seat of his car.

Jackson and Osborne were tried jointly before a jury. Superior Court Judge Milton M. Souter presided over the trial. Jackson was convicted of kidnapping,[4] first-degree sexual assault,[5] first-degree assault,[6] and third-degree assault.[7] Osborne was convicted of kidnapping, first-degree assault, and two counts of first-degree sexual assault. Judge Souter sentenced Jackson to a composite sentence of 27 years with 5 years suspended. He sentenced Osborne to 26 years with 5 years suspended. Osborne appealed his convictions and this court affirmed.[8]

Osborne then filed an application for postconviction relief on the ground that his trial counsel, Sidney K. Billingslea, provided him ineffective assistance because she decided not to seek more discriminating DNA tests. Osborne alleged that Billingslea was ineffec-

---

4. AS 11.41.300(a)(*l*)(c).

5. AS 11.41.410(a)(1).

6. AS 11.41.200(a)(4).

7. AS 11.41.220.

8. *Osborne,* Alaska App. Memorandum Opinion and Judgment No. 5329 at 19.

tive because, among other things, she did not seek more specific genetic testing of the physical evidence (*i.e.*, the condom with semen, a pubic hair, and hair on the sweater). At the time of Osborne's trial, a substantially more discriminating genetic test was available than the DQ-alpha PCR DNA test that was done by the State. In support of his application, Osborne requested the court order the physical evidence against him retested using the more discriminating DNA test to determine if Osborne was prejudiced by his trial counsel's failure to seek the more precise testing. Osborne argued that he is innocent, that he sought more discriminating DNA testing at the time of his trial, and that more specific DNA testing of the physical evidence in the case would prove Billingslea's decision was incorrect as well as prove his innocence.

In support of his application for post-conviction relief, Osborne submitted an affidavit from Billingslea. In her affidavit, Billingslea stated that she had consulted with the State's DNA crime lab expert and reviewed various materials regarding DNA testing. She also spoke with another attorney who had litigated the scientific basis of DNA testing. Billingslea concluded:

> I consulted with the DNA expert from the state crime lab about the process used here, and the reasons for using the less sophisticated method. I reviewed DNA research articles, some of which may be in the file, and some not. I spoke with and reviewed the material submitted by Geoff Wildredge, a Fairbanks public defender who was litigating the scientific basis of DNA at the time under the *Frye* standard. [because the State was relying on the less precise PCR test] The statistics were heavily in our favor, especially when compared with the census population statistics at the time. If I correctly recall, Osborne's DNA turned up in roughly 1:8 or 1:16 [sic, actually greater than one in seven] of the population.

Billingslea explained that she chose not to seek additional and more specific DNA testing, not because of the possible cost, but rather because "the statistics were in Osborne's favor, due to a relatively high fre-

quency in the population of the profile of the case DNA." Consequently, Billingslea concluded that "Osborne was in a strategically better position without [more specific] DNA testing." Billingslea reasoned:

> The State was using the local crime lab's PCR DNA testing, which included Osborne as a possible donor of the semen found in a condom at the crime scene. However, the ratio of possible donors to the general population was [small, in the neighborhood of 1:16]. I felt these were very good numbers in a mistaken identity, cross-racial identification case, where the victim was in the dark and had bad eyesight. Given the codefendant's confession which included Osborne as a perpetrator, and the absence of an air-tight alibi, I believed then, and now, that insisting on a more advanced ... DNA test would have served to prove that Osborne committed the alleged crimes.

Billingslea further stated that "[w]hile I do not have a present memory of Osborne's desire to have [a more specific discriminatory] test of his DNA done, I am willing to accept that he does, and that I would have disagreed with him, as I preferred the lower odds given in PCR testing."

Judge Gleason denied Osborne's application for post-conviction relief on the ground that Osborne had failed to make a prima facie case of ineffective assistance of counsel. Judge Gleason concluded that Billingslea investigated and considered the possibility of engaging in the more discriminating DNA test, but because "she disbelieved Osborne's statement that he did not commit the crime," she "elected to avoid the possibility of obtaining DNA test results that might have confirmed Osborne's culpability." Judge Gleason found that Billingslea made a tactical decision and that there was no basis to conclude that Billingslea's decision was incompetent. Judge Gleason also denied Osborne's related request to have the physical evidence tested by more discriminating DNA tests because Osborne did not allege facts demonstrating that his trial attorney's representation was deficient.

Osborne sought reconsideration of the court's order which was denied. He argued that he was entitled to have further DNA

testing done as a matter of due process to establish his innocence. Judge Gleason reiterated:

> that under the specific facts of this case, including the tactical decisions made by ... Osborne's trial counsel, state and federal due process and fairness do not mandate a right to post-conviction DNA testing in this particular case. Further, the court finds that ... Billingslea's investigation of the case, including her investigation of the different types of DNA testing available, was not "outside the wide range of professionally competent assistance."

Osborne appeals the superior court's denial of his application for post-conviction relief.

*Osborne did not establish a prima facie case of ineffective assistance of counsel*

■■■ Alaska uses a two-pronged standard for evaluating ineffective assistance of counsel claims.[9] "The first prong requires the accused to prove that the performance of trial counsel fell below an objective standard: Defense counsel must perform at least as well as a lawyer with ordinary training and skill in the criminal law and must conscientiously protect his client's interest, undeflected by conflicting considerations."[10] The second prong requires a showing of prejudice: "[T]here must be a showing that the lack of competency contributed to the conviction. If the first burden [the burden of proving deficient performance] has been met, all that is required additionally is to create a reasonable doubt that the incompetence contributed to the outcome."[11] "The law presumes that an attorney has acted competently, and that the attorney's decisions were prompted by sound tactical considerations. To prevail in a post-conviction relief action based on [an] ineffective assistance of counsel claim, the defendant must rebut this presumption."[12]

■■■ Our review of the record convinces us that Judge Gleason did not err in concluding that Osborne did not establish a prima facie

case that Billingslea provided him with ineffective assistance of counsel. Billingslea's affidavit establishes that she researched and considered the possibility of having more conclusive DNA tests performed on the evidence in the case, but made a tactical decision not to seek further testing because she concluded that further testing had a substantial chance of harming Osborne's case. Osborne did not present any evidence to rebut the presumption that Billingslea's decision was sound. Billingslea concluded that, if she obtained more advanced testing, her actions might result in the State obtaining additional evidence that would incriminate Osborne. She concluded that Osborne was better off with the DNA test which the State performed. This test allowed her to argue that a substantial portion—better than one in seven—of the African–American population would have matched the genetic material obtained in the sperm from the condom. Billingslea's affidavit established that her decision was a tactical one.

Osborne contends that Billingslea told him that the Office of Public Advocacy would not pay for independent DNA testing. Billingslea denied saying this. But even assuming that Osborne's statement is true, Billingslea gave a separate tactical reason for not wanting additional testing; therefore, Osborne has failed to show incompetence.

Osborne argues that he consistently asserted his innocence and asked Billingslea to obtain a more discriminating DNA test. But, as Osborne recognizes in his reply brief, the decision about whether to request additional testing was a decision for his counsel. In *Simeon v. State*,[13] this court pointed out that Alaska Rule of Professional Conduct 1.2(a) instructs that in a criminal case the client has the final authority to decide what plea to enter, whether to waive jury trial, whether to testify, and whether to take an appeal. We stated:

---

**9.** *Risher v. State,* 523 P.2d 421, 424–25 (Alaska 1974).

**10.** *State v. Jones,* 759 P.2d 558, 567 (Alaska App. 1988).

**11.** *Id.* at 567–68.

**12.** *Newby v. State,* 967 P.2d 1008, 1016 (Alaska App.1998) (footnote omitted).

**13.** 90 P.3d 181, 184 (Alaska App.2004).

The rule specifies clearly those decisions over which the client has the ultimate authority. Since the rule limits the client's authority to those decisions, it follows that the lawyer had the ultimate authority to make other decisions governing trial tactics ..."

The evidence before Judge Gleason was that Osborne's attorney made a tactical decision not to request further DNA testing. Osborne has not presented any evidence that this was an unreasonable tactic—a tactic that no competent counsel would adopt. We conclude that Judge Gleason did not err in determining that Osborne had not established a prima facie case of ineffective assistance of counsel.

*Osborne's potential due process right to have more DNA tests performed*

██ In the superior court, Osborne's primary contention was that his trial attorney was incompetent for failing to pursue the more discriminating DNA testing that was available at the time of Osborne's trial. As part of his requested relief, Osborne asked the superior court to order the more discriminating DNA tests performed on the physical evidence in his case. As we have previously explained, Osborne did not establish that his trial attorney's decision was incompetent. Osborne was therefore not entitled to any relief under this theory—even if we assume that further DNA testing would be favorable to him.

But after Judge Gleason rejected Osborne's ineffective assistance of counsel claim, Osborne then raised a new theory of post-conviction relief: He contended that he had a due process right to have the physical evidence retested so that he could show that he was factually innocent of the crimes for which he was convicted. Judge Gleason rejected Osborne's due process claim, and Osborne now appeals this ruling.

Osborne points out that there are cases where defendants convicted of crimes have been exonerated by later DNA testing. He argues that, under the due process clauses of both the Alaska and Federal Constitutions, he has the right to perform further tests on the physical evidence.

(As an alternative legal basis for his claim that he is entitled to new DNA testing, Osborne relies on AS 12.55.015(h) and AS 44.41.035(a).[14] But these statutes merely set up a system for collecting the DNA of people who are convicted of certain offenses. These statutes do not provide a procedure for defendants seeking post-conviction relief to obtain physical evidence and subject it to DNA testing.)

As we explain here, there are several problems with Osborne's due process contention.

A provision of Alaska's post-conviction relief statute, AS 12.72.020(b)(2), declares that a defendant is entitled to post-conviction relief if the defendant presents newly discovered evidence that "establishes by clear and convincing evidence" that the defendant is innocent.[15] But this same provision declares that a claim based on newly discovered evidence will be heard only if the defendant "establishes due diligence in presenting the claim" and further shows that the evidence supporting the claim "was not known within ... two years after entry of the judgment of conviction."[16]

The State points out that Osborne's due process claim is apparently barred by this statute because the physical evidence in this case is not newly discovered, because the DNA testing that Osborne proposes to perform on this evidence existed at the time of Osborne's trial, and because Osborne's trial attorney was aware of this and consciously chose not to seek more specific testing.

In *Grinols v. State*,[17] we suggested (without resolving the issue) that the due process

14. AS 44.41.035(a) declares that "the Department of Public Safety shall establish a deoxyribonucleic acid (DNA) identification registration system." AS 12.55.015(h) directs sentencing courts to order the collection of genetic samples from persons convicted of specified crimes for inclusion in the state DNA registry.

15. AS 12.72.020(b)(2)(D).

16. AS 12.72.020(b)(2)(A).

17. 10 P.3d 600 (Alaska App.2000).

clause of the Alaska Constitution would require some avenue of relief "where a constitutional violation has probably resulted in the conviction of one who is actually innocent."[18] Even though Osborne's claim of innocence is apparently barred by AS 12.72.020(b)(2)—because of the statute's twin requirements of (1) evidence that is truly new or newly discovered and (2) due diligence in pursuing the claim—it might still be argued that the due process clause requires us to ignore the wording of the statute and allow Osborne to pursue his claim, as long as there is some chance that he could prove himself innocent by clear and convincing evidence.

But *Grinols* speaks of a due process right to rectify a *constitutional violation* that has resulted in the conviction of someone who is factually innocent. It is not clear that there has been any constitutional violation in Osborne's case. We have already rejected Osborne's contention that his trial attorney was incompetent for failing to seek more discriminating DNA testing. And, at least under federal law, a defendant who has received a fair trial apparently has no due process right to present new post-conviction evidence, even when that evidence would demonstrate the defendant's innocence.

This issue was presented to the United States Supreme Court in *Herrera v. Collins*.[19] The issue in *Herrera* was the constitutionality of Texas's 30–day time limit on motions for a new trial based on newly discovered evidence. The Court ruled that it is constitutional for a state to enforce such a time limit—even when there is no other statutory remedy available for bringing a claim of actual innocence. The Court in *Herrera* further held that the existence of newly discovered evidence relevant to the guilt of a prisoner is not a ground for relief under the federal Habeas Corpus Act: "[F]ederal habeas courts sit to ensure that individuals are not imprisoned in violation of the Constitution—not to correct errors of fact."[20]

Concurring in *Herrera*, Justices Scalia and Thomas expressed their belief that "[t]here is no basis in text, tradition, or even in contemporary practice ... for finding ... a [constitutional] right to demand judicial consideration of newly discovered evidence of innocence brought forward after conviction."[21]

Our research has disclosed several cases in which courts granted defendants' requests for post-conviction DNA testing, relying (or apparently relying) on the rationale that due process demanded such testing.[22] But many

**18.** *Id.* at 615 (quoting *Murray v. Carrier*, 477 U.S. 478, 496, 106 S.Ct. 2639, 2649, 91 L.Ed.2d 397 (1986)).

**19.** 506 U.S. 390, 113 S.Ct. 853, 122 L.Ed.2d 203 (1993).

**20.** *Id.* at 400, 113 S.Ct. at 860.

**21.** *Id.* at 427–28, 113 S.Ct. at 874. (Scalia, J., concurring).

**22.** The following cases address, either directly or indirectly, a due process or fundamental fairness right to post-conviction DNA testing: *Toney v. Gammon*, 79 F.3d 693, 700 (8th Cir.1996) (reversing the district court's refusal to permit a habeas petitioner alleging ineffective assistance of counsel to conduct DNA tests that were not available at time of trial, where the petitioner consistently maintained his innocence and claimed the test results could exonerate him); *Godschalk v. Montgomery County Dist. Attorney's Office*, 177 F.Supp.2d 366, 370 (E.D.Pa.2001) ("plaintiff has a due process right of access to the genetic material for the limited purpose of DNA testing"); *Sewell v. State*, 592 N.E.2d 705, 707–08 (Ind.App.1992) (finding "the analysis of fundamental fairness issues relative to DNA testing

persuasive," and explaining that *Brady v. Maryland*, which requires the prosecution to disclose exculpatory evidence, "is implicated in post-conviction requests for forensic tests ... where a conviction rested largely upon identification evidence and advanced technology could definitively establish the accused's innocence"); *State v. Thomas*, 245 N.J.Super. 428, 586 A.2d 250, 251–54 (Ct.App.Div.1991) (reversing "the order denying defendant's motion for DNA testing of the rape kit material and cell samples supplied by him" because "considerations of fundamental fairness demand the testing"); *Dabbs v. Vergari*, 149 Misc.2d 844, 570 N.Y.S.2d 765, 767–69 (N.Y.App.1990) (relying in part on the due process clause, the court held that the evidence should be subject to discovery and DNA testing even after conviction when the evidence has been preserved and has a high exculpatory potential); *Commonwealth v. Brison*, 421 Pa.Super. 442, 618 A.2d 420, 423–25 (1992) (principles of justice required remand to trial court to allow defendant to engage in DNA testing). *But see Arizona v. Youngblood*, 488 U.S. 51, 58–59, 109 S.Ct. 333, 337–38, 102 L.Ed.2d 281 (1988) (due process clause is not violated when the police fail to use a particular investigatory tool, such as a newer test, on semen samples).

of these cases were decided before *Herrera*. This means that, to the extent these cases relied on a federal due process analysis, their reasoning and conclusions are now suspect. After *Herrera*, the tide is definitely against any purported federal due process right to post-conviction DNA testing.[23]

Several courts have flatly interpreted the *Herrera* decision to mean that defendants have no federal due process right to present post-conviction evidence of their innocence—that if defendants are to have such a right, it must be granted by the legislature.[24]

The strongest rejection of a federal due process right to post-conviction DNA testing is found in *Harvey v. Horan*:[25]

Harvey would have this court fashion a substantive right to post-conviction DNA testing out of whole cloth or the vague contours of the Due Process Clause. We are asked to declare a general constitutional right for every inmate to continually challenge a valid conviction based on whatever technological advances may have occurred since his conviction became final. The Supreme Court has made clear that the finality of convictions cannot be brought into question by every change in the law.... Similarly, we believe that finality cannot be sacrificed to every change in technology. The possibility of post-conviction developments, whether in law or science, is simply too great to justify judicially sanctioned constitutional attacks upon final criminal judgments.

In so holding, we acknowledge that finality is not a value that trumps all others. In some circumstances newly discovered evidence may warrant a new trial. *See, e.g., United States v. Christy*, 3 F.3d 765, 768 (4th Cir.1993). But there is no newly discovered evidence in this case. Instead, Harvey seeks to subject existing biological evidence to new DNA testing. This evidence was already subjected to DNA testing using the best technology available at the time Harvey's conviction became final. Establishing a constitutional due process right under § 1983 to retest evidence with each forward step in forensic science would leave perfectly valid judgments in a perpetually unsettled state. This we cannot do. In *Teague [v. Lane ]*, the [Supreme] Court stressed that finality "is essential to the operation of our criminal justice system," and that "[w]ithout finality, the criminal law is deprived of much of its deterrent effect." 489 U.S. [288,] 309, 109 S.Ct. 1060 [103 L.Ed.2d 334] (plurality opinion). *See also McCleskey v. Zant*, 499 U.S. 467, 491–92, 111 S.Ct. 1454, 113 L.Ed.2d 517 (1991). While finality is not the sole value in the criminal justice system, neither is it subject to the kind of blunt abrogation that would occur with the recognition of a due process entitlement to post-conviction access to DNA evidence.

. . . .

In [reaching this decision] ... we do not declare that criminal defendants should not be allowed to avail themselves of advances in technology. Rather, our decision reflects the core democratic ideal that if this entitlement is to be conferred, it should be accomplished by legislative action rather than by a federal court as a matter of constitutional right. Permitting Harvey's § 1983 claim to proceed would improperly short-circuit legislative activity by allowing judges, rather than legislatures, to determine the contours of the right.[26]

**23.** *See, e.g., Spencer v. Murray*, 5 F.3d 758, 765 (4th Cir.1993) (holding that actual innocence is not itself a constitutional claim, and that the defendant's assertion of potential errors in prior DNA tests could not form the basis for federal habeas relief, since the defendant was claiming factual innocence rather than any error at his trial).

**24.** *See State v. El–Tabech*, 259 Neb. 509, 610 N.W.2d 737, 746–47 (2000) (holding that there is no constitutional right to demand judicial consideration of newly discovered evidence after the statutory time limit has expired for seeking a motion for new trial based on newly discovered evidence—and that this is true even if the new evidence establishes the defendant's factual innocence); *see also Sewell v. State*, 592 N.E.2d 705, 708 (Ind.App.1992) (holding that a defendant has no federal due process right to discovery of new evidence).

**25.** 278 F.3d 370 (4th Cir.2002).

**26.** *Id.* at 375–76.

It appears, therefore, that Osborne has no due process right under the federal constitution to present new evidence to establish his factual innocence.

As explained above, Alaska law—AS 12.72.020(b)(2)—does allow convicted defendants to present new evidence to establish their factual innocence, but only if the evidence is newly discovered, and only if the defendant exercises due diligence in presenting his or her claim. Because of these two statutory restrictions, Osborne apparently does not qualify for post-conviction relief. Thus, even if Osborne could show that more discriminating DNA testing would yield results favorable to him, Osborne seemingly could not obtain post-conviction relief unless we were ready to declare, as a matter of Alaska constitutional law, that these two statutory restrictions are unconstitutional (or, at least, unconstitutional as applied to Osborne).

We acknowledge that several state courts have held that defendants have a due process right, under their respective state constitutions, to obtain post-conviction DNA testing of physical evidence, and to offer the results of that testing to establish their factual innocence. But even these court decisions present a legal hurdle to Osborne. The great majority of these decisions strictly circumscribe the due process right to post-conviction DNA testing. These cases hold that a defendant is not entitled to this testing unless the defendant shows (1) that their conviction rested primarily on eyewitness identification evidence, (2) that there was a demonstrable doubt concerning the defendant's identification as the perpetrator, and (3) that scientific testing would likely be conclusive on this issue.[27]

It is not clear, from the record before us, that Osborne could meet this three-part test. The State, for its part, contends that the rest of its case against Osborne was so strong that, even if Osborne were allowed to conduct the proposed DNA testing, and even if the results of that testing were to favor Osborne, Osborne still could not show that these favorable results constituted clear and convincing proof of his innocence. However, the State concedes that Judge Gleason did not reach this issue.

■ In spite of the substantial legal hurdles that we have described here, we are reluctant to hold that Alaska law offers no remedy to defendants who could prove their factual innocence. We are prepared to hold, however, that a defendant who seeks post-conviction DNA testing must, at a minimum, meet the three-part test endorsed by the state courts whose decisions we discussed above. That is, the defendant must show (1) that the conviction rested primarily on eyewitness identification evidence, (2) that there was a demonstrable doubt concerning the defendant's identification as the perpetrator, and (3) that scientific testing would likely be conclusive on this issue.

We therefore remand Osborne's case to the superior court. The superior court should consider whether Osborne can meet this test. In addition, the superior court should consider whether, even assuming that Osborne meets this test, his claim is nevertheless barred by the twin statutory limitations codified in AS 12.72.020(b)(2)—the requirements that (1) the evidence be truly new or newly discovered and that (2) Osborne showed due diligence in pursuing the claim.

Finally, if the superior court determines that Osborne satisfies the three requirements for post-conviction DNA testing, but also that his claim is barred by AS 12.72.020(b)(2), the superior court should then consider whether the due process clause of the Alaska Constitution requires us to disregard the statutory limitations and allow Osborne to pursue his claim.

27. *See People v. Washington,* 171 Ill.2d 475, 216 Ill.Dec. 773, 665 N.E.2d 1330, 1336–37 (1996); *Sewell,* 592 N.E.2d at 708; *Williams v. State,* 791 N.E.2d 193, 194 (Ind.2003); *Mebane v. State,* 21 Kan.App.2d 533, 902 P.2d 494, 497 (1995); *State v. White,* 260 N.J.Super. 531, 617 A.2d 272, 276–77 (Ct.App.Div.1992); *Commonwealth v. Reese,* 444 Pa.Super. 38, 663 A.2d 206, 208–09 (1995); *Jenner v. Dooley,* 590 N.W.2d 463, 471–72 (S.D. 1999); *Commonwealth v. Robinson,* 452 Pa.Super. 606, 682 A.2d 831, 837–38 (1996); *In re Personal Restraint of Gentry,* 137 Wash.2d 378, 972 P.2d 1250, 1258 (1999); *see also Barnabei v. Angelone,* 214 F.3d 463, 474 (4th Cir.2000); *Jones v. Wood,* 114 F.3d 1002, 1009 (9th Cir. 1997).

Judge Gleason may hold any further proceedings that she believes would be necessary or helpful in reaching these decisions. The judge shall issue findings and rulings on these issues within 90 days. The parties shall then have 30 days to file memoranda responding to Judge Gleason's findings and rulings. When we have received Judge Gleason's findings and rulings, as well as any memoranda filed by the parties, we shall resume our consideration of Osborne's claim that he has a due process right to obtain post-conviction DNA testing of the physical evidence.

We retain jurisdiction of this case.